[No. B196639. Second Dist., Div. Four. July 19, 2010.]

HUB CITY SOLID WASTE SERVICES, INC., et al., Plaintiffs,
Cross-defendants and Appellants, v.
CITY OF COMPTON, Defendant, Cross-complainant and Respondent.

### COUNSEL

Philip D. Dapeer, A Law Corporation, Philip D. Dapeer; Law Office of Edward M. Medvene and Edward M. Medvene for Plaintiffs, Cross-defendants and Appellants.

Goodstein & Berman, Gary J. Goodstein and Bruce A. Berman for Defendant, Cross-complainant and Respondent.

### OPINION

**EPSTEIN, P. J.**—This conflict of interest case grew out of a suit and cross-action centering on the activities of appellants Michael Aloyan and Hub City Solid Waste Services, Inc. (HUB). The City of Compton had awarded a 15-year waste collection franchise to HUB. Some years later, Compton terminated the franchise. HUB sued for breach of contract. Compton cross-complained against HUB and Aloyan, seeking to void the contract and disgorge funds from appellants.

The trial court found that Aloyan was HUB's alter ego, and granted summary adjudication in favor of Compton on its claim for declaratory relief that it did not breach the franchise agreement when terminating it. At trial, Compton advanced two conflict of interest theories under Government Code section 1090 (section 1090), arguing that Aloyan had a prohibited financial interest in the franchise because of his role in managing Compton's in-house waste division, and the franchise was void because members of the Compton city council had illegal interests related to campaign contributions and favors given by HUB and Aloyan. A jury unanimously found that appellants had violated section 1090 and were liable for over $22 million in damages to Compton. Compton's motion for nonsuit was then granted as to appellants' complaint.

This appeal followed. Appellants argue section 1090 does not apply because neither Aloyan nor HUB was an official or employee of the city, and there was insufficient evidence to prove bribery of city council members. We disagree. Evidence presented at trial supported a finding that Aloyan, through American Utilities Services Limited Liability Company (AUS), acted as a public official in advising Compton on its waste collection operations. There also was sufficient evidence showing that the campaign contributions and jobs for the council members' relatives were provided in return for the council members' approval of the franchise agreement with HUB. The trial court did not abuse its discretion in allowing the introduction of evidence about Aloyan's prior involvement with payments to public officials in connection with government contracts.

Appellants also claim that the trial court erred in determining that Aloyan was HUB's alter ego, and that disgorgement was not the appropriate remedy. As we shall explain, we do not agree.

## FACTUAL AND PROCEDURAL SUMMARY

Following well-established rules on appellate review after a trial on the merits, we construe the facts in the light most favorable to the judgment. (*Woodman Partners v. Sofa U Love* (2001) 94 Cal.App.4th 766, 771 [114 Cal.Rptr.2d 566].)

Private vendors held franchises for Compton's waste collection operations. These agreements were due to expire in 2000. In 1999, Compton's assistant city manager, Lawrence Adams, was instructed to study the feasibility of the city internalizing its waste management services. Requests for proposals for new franchise agreements were suspended. A feasibility study and an associated business plan projected more than $700,000 in annual savings for Compton if it brought its waste management "in-house."

Beginning in 1999, Aloyan advised Adams and other city staff about Compton's efforts to establish an in-house waste management division. Aloyan had been involved with the city's waste management in the early 1990's, and Adams valued his expertise. In May 2000, Compton entered into a management agreement with Aloyan's company, AUS.[1] Under the management agreement, AUS was an independent contractor but assumed many of the city's waste management needs; Adams described AUS as "providing the private management" of the city's in-house waste operation. Before the city began collecting waste in September 2000, Aloyan identified vendors, and

---

[1] AUS had no employees other than Aloyan, no equipment, and no offices. Aloyan met with Adams and other city officials at city hall or at an IHOP restaurant.

negotiated to acquire trucks, refuse containers, and real estate on behalf of the city. He negotiated a transfer station disposal contract and a contract for a maintenance facility. Aloyan had discretion over which vendors to solicit, and influenced the city's staffing decisions. He assisted Compton with the acquisition of insurance, and discussed the possibility of outsourcing waste hauling operations to a private contractor. Under the agreement Aloyan acted as the director of the in-house waste division, working alongside city employees, overseeing day-to-day operations of Compton's waste management division, and taking responsibility for public education and compliance with state-mandated recycling and waste reduction efforts. The agreement remained in force until February 2001.

In 2000, Compton decided to terminate the city's police department and contract with the Los Angeles County Sheriff's Department for law enforcement services. In the summer of 2000, Compton's controller released a report showing an unexpected transition liability of $5 million arising from severance pay for police officers and other costs. Shortly thereafter, Aloyan approached Adams and offered Compton $5 million in return for taking over the in-house waste disposal operation on a franchise basis. A day or two later, Aloyan submitted a written proposal to that effect on behalf of AUS. Aloyan's proposal was later reduced to a $2 million initial fee plus $700,000 in annual fees for a 15-year contract. Aloyan proposed licensing the city's newly purchased trucks, equipment and facilities from Compton, and hiring the city's waste management employees.

Adams recommended to the city council that, because of the urgent need for funding to address the police department liability, Compton negotiate with AUS rather than solicit bids for a franchise. In September 2000, Aloyan created HUB, and substituted that entity as the proposed franchisee. HUB had no trucks, equipment, or facilities.[2]

In December 2000, the city council held a public hearing on the proposed franchise with HUB. The no-bid process was a topic of discussion, as was Aloyan's reputation and character. The council voted four to one in favor of awarding the franchise to HUB. As we discuss in detail, *post*, in February 2001, shortly after franchise operations began, HUB made contributions to Councilmembers Delores Zurita, Amen Rahh, and Mayor Omar Bradley. All had voted in favor of the franchise. HUB was the largest contributor to each council member's campaign. The only council member who voted against the franchise did not receive a campaign contribution.

After the franchise was awarded, HUB hired several of Bradley's relatives. Bradley's brother, Henry Bradley, was hired although he had no experience in

---

[2] Aloyan was HUB's sole shareholder, officer and director. HUB was capitalized entirely with debt, and its liabilities exceeded its assets.

waste management, because he was valued by Aloyan as "the biggest bookie in Compton." HUB also hired or gave monetary gifts of approximately $1,000 each to other relatives of Bradley and Councilmember Zurita, including Wayne Bradley, Janna Zurita, Fatin Bradley, Jerome Taylor, Charlotte Bradley, and Jamal Bradley.

In September 2004, the city council voted to terminate the franchise agreement. The termination was based on HUB's failure to file required campaign finance disclosures for contributions to Compton's city council members, its alleged violation of section 1090, and Aloyan's conviction in federal court for attempted bribery in connection with a trash contract with the City of Carson. Appellants commenced this action later that month. The operative complaint was filed by HUB against Compton in December 2004, and claimed breach of contract, bad faith, unjust enrichment, and declaratory relief. In January 2005, Compton filed a cross-complaint against appellants, asserting claims for violation of section 1090, declaratory relief, and alter ego liability against Aloyan for HUB's actions. Answers were filed and the actions were consolidated.

The trial court denied Compton's motion for summary adjudication of its cause of action seeking declaratory relief as to whether its termination of the franchise agreement amounted to breach. The court found that appellants had raised triable issues of fact. In December of 2005, both parties filed motions to bifurcate the trial on the issue of alter ego liability, but disputed the order in which that issue would be tried. The trial court decided to try Aloyan's alter ego liability before the merits of the parties' claims. After a bench trial, the court found that Aloyan was the alter ego of HUB for purposes of the cross-complaint.

In July 2006, the trial court, acting sua sponte, reconsidered its denial of Compton's motion for summary adjudication. Following briefing and argument, the court entered summary adjudication as to Compton's cause of action for declaratory relief, finding that Compton did not breach the franchise agreement by terminating it without providing Aloyan notice, hearing, or an opportunity to cure.

In a motion in limine, appellants unsuccessfully sought to exclude evidence about prior acts of Aloyan. The challenged evidence showed that Aloyan offered to sell AUS to an executive of the Waste Management Corporation, and Aloyan threatened that if Waste Management did not purchase AUS, Aloyan would advise other cities to bring their waste management services in-house, depriving Waste Management of business. Aloyan told the executive about his plan to purchase Compton's in-house waste division, and suggested that he was well acquainted with Compton officials. The challenged evidence also showed that Aloyan had been involved with payments

to Compton city council members in the 1990's related to government contracts, and had been convicted of attempted bribery of a member of the City of Carson city council for which he served five months in a federal prison camp. Appellants also challenged the introduction of evidence that HUB had paid $48,000 to an organization controlled by an individual named Albert Robles.[3]

Jury trial commenced in October 2006. The issues remaining were appellants' claim for money owed under the franchise agreement prior to termination, and Compton's cross-claim for restitution of all amounts paid to HUB under the franchise agreement. At the close of appellants' case-in-chief, Compton moved for nonsuit, arguing the franchise was void because it lacked a mayoral signature; after trial the motion was granted. The jury returned a unanimous verdict, finding the franchise was obtained in violation of section 1090, and awarded Compton $22,402,759.10 on its cross-complaint. This appeal from the judgment followed.

## DISCUSSION

## I

Appellants argue the trial court erred in its application of the alter ego doctrine. They contend that because the court bifurcated the proceedings to determine alter ego before the merits of the parties' claims were tried, there was no finding that HUB engaged in malfeasance necessitating the application of the doctrine. This claim does not have merit.

██ "In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal.Rptr.2d 824].) "The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' [Citation.]" (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 [216 Cal.Rptr. 443, 702 P.2d 601].)

---

[3] At trial, Compton's counsel asked Aloyan whether Robles was the treasurer of the City of South Gate. The court sustained an objection by appellants, and an answer to that question is not in evidence.

In determining a unity of interest between appellants, the trial court found HUB was formed for the sole purpose of entering into the franchise agreement with Compton, it was inadequately capitalized, and diverted assets to pay (among other things) for Aloyan's personal credit card expenses and criminal defense expenses. The trial court also found that HUB did not have a board of directors as required by its articles of incorporation, and that Aloyan was HUB's sole shareholder, director, and officer. Aloyan was represented by the same attorneys as HUB in the underlying transaction with Compton and in the present action. Appellants do not challenge the trial court's finding that there was a unity of interest, but argue there was insufficient evidence to show an inequitable result would occur if HUB alone was found liable on the claims alleged by Compton in its cross-complaint.

■ "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at p. 539.) The trial court found that "inequity would result if the wrongdoing the City alleges in its cross-complaint were treated as those of HUB alone. Because of Aloyan's practice of diverting HUB's cash in the form of distributions to himself and others, profit-sharing 'advances,' [and] payment of Aloyan's personal expenses . . . HUB remained essentially undercapitalized, while Aloyan's personal wealth increased. Under these circumstances . . . in the event that the City obtains a verdict against HUB and Aloyan on its cross-complaint, it would be unjust to limit the City to recovering from HUB alone. . . . [T]he evidence in Phase I of the trial overwhelmingly demonstrates that Aloyan's conduct amounting to bad faith makes it inequitable for him to hide behind the corporate veil."

Appellants argue that no malfeasance on the part of HUB had been shown at the bench trial, and also contend that the inability of Compton to collect from HUB was not a sufficient basis for the determination of alter ego. HUB's inability to pay was not the basis for the determination: the trial court found bad faith conduct on the part of Aloyan. HUB was a vehicle created by Aloyan solely for the waste management franchise with Compton, and ceased to exist when the franchise agreement was terminated. HUB was undercapitalized and used as a source of funds for a variety of purposes not related to the franchise.[4] Aloyan abused the corporate privilege; the evidence showed that an inequitable result would occur if HUB alone was held liable.

---

[4] In their reply brief, appellants challenge the trial court's finding that HUB was undercapitalized. The contention is contained within a single brief paragraph and does not contain citation to authority or the record. For these reasons and because it was not raised in appellants' opening brief, we treat the issue as forfeited. (See *Truong v. Glasser* (2009) 181 Cal.App.4th 102, 115, fn. 5 [103 Cal.Rptr.3d 811]; Cal. Rules of Court, rule 8.204(a)(1)(B), (C).)

Appellants argue the trial court applied the "doctrine in reverse" to hold that Aloyan's conviction for attempted bribery could be imputed to HUB and thereby provide a basis for Compton's termination of the franchise agreement. As we discuss in part V, *post*, we do not reach the appeal of the order granting summary adjudication, and we therefore do not consider this contention.

█ In its statement of decision following the trial on alter ego, the trial court found that "cross defendant Michael Aloyan is the alter ego of cross defendant HUB City for the purposes of the claims alleged against HUB in the cross-complaint of the City of Compton." The court expressed the doctrine incorrectly, but there was no error in its application. The piercing of the corporate veil is "justified as an equitable remedy when the shareholders have abused the corporate form to evade individual liability, circumvent a statute, or accomplish a wrongful purpose." (*Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1522 [77 Cal.Rptr.3d 96], citing 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, §§ 9, 11–12.)[5] Aloyan used HUB as a shell corporation, and there was no error in the trial court's application of the alter ego doctrine to hold Aloyan accountable for HUB's actions should the jury find that section 1090 was violated.

## II

Appellants argue that section 1090 was not violated. They challenge both theories of liability advanced by Compton, contending that neither Aloyan nor AUS was a public official or employee falling within the scope of the statute, and that there is insufficient evidence to prove bribery of Compton city council members.

## A

█ Section 1090 provides, in pertinent part: "[C]ity officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." Any contract in which an official is financially interested is void. (Gov. Code, § 1092; *Klistoff v. Superior Court* (2007) 157 Cal.App.4th 469, 481 [68 Cal.Rptr.3d 704].) A person in an advisory position to a city may fall within the scope of section 1090. In particular, independent contractors whose

---

[5] In *Postal Instant Press, Inc. v. Kaswa Corp., supra*, 162 Cal.App.4th at page 1522, the court rejected the doctrine of "outside reverse piercing" whereby the corporate veil is pierced to allow creditors to reach corporate assets to satisfy claims against an individual shareholder. Unsurprisingly, neither party cited this case, as it did not present an allegation of an abuse of the corporate form at issue here.

official capacities carry the potential to exert considerable influence over the contracting decisions of a public agency may not have personal interests in that agency's contracts. (*California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 693 [56 Cal.Rptr.3d 92] (*California Housing Finance Agency*).)

■ Appellants argue there was insufficient evidence showing that Aloyan or AUS was a public official or employee under section 1090. We disagree. Section 1090 has been applied to attorneys who render their professional services to a city even though they may have the common law status of an independent contractor. (See *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1278–1279 [125 Cal.Rptr.2d 225] [defendant partner at private law firm acting as city attorney under a contract violated § 1090 based on fees earned in connection with bond issues]; *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533, 541 [49 Cal.Rptr.2d 676] [private attorney liable under § 1090 for profiting from contingency fee agreement with outside law firm]; *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 291 [295 P.2d 113] [contract attorney violated § 1090 by purchasing properties from city at below fair market value].) Appellants attempt to distinguish these cases, arguing that corporate consultants such as AUS do not owe municipalities the fiduciary duty of an attorney. That may be so, but the statute is not limited to abuse of the attorney-client relationship. Section 1090 is a prophylactic against personal gain at public expense. (*Klistoff v. Superior Court, supra,* 157 Cal.App.4th at p. 479.) An individual's status as an official under that statute turns on the extent to which the person influences an agency's contracting decisions or otherwise acts in a capacity that demands the public trust. (See *California Housing Finance Agency, supra,* 148 Cal.App.4th at pp. 692–693.)

■ The evidence presented at trial was sufficient to establish that Aloyan fell within the ambit of section 1090. Pursuant to the management agreement between AUS and Compton, Aloyan supervised city staff, negotiated contracts, and purchased equipment and real estate on behalf of the city. His activities served a public function, and he was intricately involved in the city's waste management decisions. As HUB's alter ego (see pt. I, *ante*), Aloyan had a personal financial stake in the franchise agreement. That interest was neither remote nor speculative, and resulted in an immediate and obvious conflict of interest. It cast doubt on whether Aloyan was acting in Compton's best interest when he proposed franchising the city's waste management services and licensing city-owned equipment and facilities.

██ Appellants argue that Aloyan made the franchise agreement between Compton and HUB on HUB's behalf and not as a representative of the city. The " 'negotiations, discussions, reasoning, planning and give and take' " leading to the execution of a contract are deemed to be part of the making of an agreement under section 1090. (*People v. Gnass, supra,* 101 Cal.App.4th at p. 1293, quoting *Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289].) " 'The purpose of [section 1090] is to prevent a situation where a public official would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence.' " (*Gnass,* at p. 1297.) As its private manager, Aloyan had a unique understanding of Compton's in-house waste management system. He influenced staffing decisions and negotiated to acquire equipment and property. Aloyan was still in his official capacity when he proposed a waste management franchise to Adams, and continued in that capacity as he negotiated the franchise agreement with Compton and prepared the city's in-house waste division for the franchise's implementation.

In a conversation in May or June of 2000 with Ray Burke, an executive from Waste Management, Aloyan offered to sell AUS to Waste Management. Aloyan told Burke that his strategy with Compton was to "get the city into the collection business, and then he was going to purchase the business from the city." Aloyan suggested that he would obtain the franchise because he "knew the city of Compton officials very well." As we discussed, Aloyan also told Burke that unless Waste Management purchased AUS for $5 million, Aloyan would advise other cities where Waste Management had business to eliminate their agreements with Waste Management and secure their own solid waste services. This conversation shows Aloyan intended to use his position as a private manager of Compton's in-house waste division to make a franchise agreement with that city, and planned to pursue similar schemes in other cities. (We discuss the admissibility of this evidence in pt. III, *post.*)

The evidence reasonably supports the conclusion that Aloyan leveraged his public position for access to city officials and influenced them for his pecuniary benefit. Aloyan, through AUS, performed public functions that brought his actions within section 1090's prohibition on self-dealing. Appellants argue that the involvement of appellants' counsel and Compton's city attorney in franchise negotiations shows that Aloyan did not make the contract pursuant to section 1090. But there is substantial evidence showing that Aloyan made the franchise agreement with Compton in his official capacity, as he used his access to city officials and position in Compton's government to secure a public contract. In so doing, he violated section 1090.

Appellants argue that because AUS, and not Aloyan individually, was the contractual manager of Compton's in-house waste division, Aloyan cannot be subject to liability under section 1090. The trial court did not determine alter ego as to Aloyan and AUS. But this was not necessary. (See *People v. Honig* (1996) 48 Cal.App.4th 289, 315 [55 Cal.Rptr.2d 555] [" 'However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established.' "].) Aloyan, AUS's president, signed the management agreement with Compton. Aloyan's expertise motivated Compton to enter the agreement, which provided for Aloyan's personal involvement in Compton's affairs. AUS's status as the contracting entity with Compton was immaterial because Aloyan's actions fell within the scope of section 1090.

**B**

Appellants claim there was no showing that Compton city council members or Mayor Bradley was financially interested in the franchise agreement for purposes of section 1090. Specifically, they argue that the record contains no affirmative proof that Aloyan bribed city council members by offering them campaign contributions and jobs for their relatives in return for the members' votes approving the franchise agreement.

Appellants do not claim that campaign contributions are not financial interests under section 1090, but, citing *Buckley v. Valeo* (1976) 424 U.S. 1, 39 [46 L.Ed.2d 659, 96 S.Ct. 612], argue that we should consider the primacy of the right to political speech when analyzing the sufficiency of the evidence showing the council members were financially interested in the franchise agreement. They contend that only direct evidence should be sufficient to prove contributions were made in exchange for votes, rather than as legitimate support for the members' position on the agreement.

■ We find no authority for their assertion that only direct evidence may be considered on this issue. We conclude that all admissible evidence—direct and circumstantial—may be considered, and the evidence in this case was sufficient to show that the council members, including the mayor, had illegal interests in the contract within the meaning of section 1090. Financial interests prohibited by section 1090 "are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances." (*People v. Honig, supra*, 48 Cal.App.4th at p. 315.) In *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205 [97 Cal.Rptr.2d 467] (*BreakZone Billiards*), the court found that council members who had received campaign contributions ranging from $100 to $5,500 more than 17 months before a vote did not have a prohibited

financial interest under section 1090 because there was no evidence the members received a personal benefit that swayed their judgment. (*BreakZone Billiards*, at p. 1231.) In considering whether there was a common law conflict of interest violation, the court noted in dicta: "We contrast the facts of this case with one in which it is alleged the campaign contribution is made in return for an express promise to act in a particular way in exercising governmental authority with respect to a particular matter then pending or which may be presented for governmental review and action at a later date. . . . We do not foreclose a circumstance in which an earlier governmental action is 'rewarded' in an illegal manner . . . ." (*Id.* at p. 1233.) While this prescient dictum is addressed to a hypothetical "express promise" the decision did not foreclose the adequacy of proof by circumstantial evidence as sufficient to render a contract void under section 1090.

■ We conclude that proof that a campaign contribution constitutes an illegal interest within the meaning of section 1090 may be shown by circumstantial evidence. The purpose of section 1090 is to prohibit self-dealing, not legitimate political activity. (*BreakZone Billiards, supra,* 81 Cal.App.4th at p. 1230.) "Public policy strongly encourages the giving and receiving of campaign contributions." (*Woodland Hills Residents Assn., Inc. v. City Council* (1980) 26 Cal.3d 938, 947 [164 Cal.Rptr. 255, 609 P.2d 1029].)[6] But the statute must be broadly construed to further the Legislature's purpose of regulating the conduct of public officials. (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1335 [44 Cal.Rptr.3d 881].) To do otherwise would "permit certain categories of schemes and improprieties to go unchecked, a result which would undermine the public's confidence not only in the government, but in the court system ruling on such cases." (*Ibid.*) The fact that persons or entities make campaign contributions to officials who favor a particular position or who support the donor does not prove illegality. But illegality is proven if there is an understanding that a payment is made in anticipation of political favor or on account of favors given, and then only if the political act was made on account of the payment or agreement to pay. This may be, but rarely is, shown by direct evidence of a scheme to repay an official's award of a public contract through campaign contributions made by the contracting entity. It also may be shown by circumstantial evidence.

"When findings of fact are challenged on appeal, we are bound by the familiar and highly deferential substantial evidence standard of review. This

---

[6] In *Woodland Hills Residents Assn., Inc. v. City Council, supra,* 26 Cal.3d 938, the Supreme Court held that campaign contributions to city council members from parties having a financial interest in an application before the council did not disqualify those members from voting on the application. (*Id.* at p. 945.) The application came before the council in a quasi-judicial hearing and did not involve the making of a government contract with a campaign contributor. No allegation of bribery was made, and two recipients of campaign contributions voted against the application. (*Ibid.*)

standard calls for review of the entire record to determine whether there is any substantial evidence, contradicted or not contradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor." (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567 [90 Cal.Rptr.3d 644].)

In this case the evidence was sufficient to support a finding that certain Compton city council members supported HUB's franchise proposal in return for campaign contributions from HUB. The franchise proposal was not put out to bid. At the hearing where the city council considered HUB's proposal, no mention was made of Compton's financial difficulties, although the termination of the city's police department was the ostensible reason for the city's decision to re-outsource its waste management. Although appellants offer innocent explanations for the form in which the franchise proposal was presented to the council, we view the evidence in the light most favorable to the prevailing party. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

There was opposition from members of the public to the agreement, which centered on the no-bid process and Aloyan's reputation, including opposition from a member of Congress who questioned the propriety of the deal. A member of the public who spoke in favor of HUB's proposal later received a political contribution from HUB, and in 2004 was hired by the company as a part-time "community representative." At the hearing, a representative of a waste management company requested 48 hours to prepare a competing bid. His comments were met with applause from the audience, but no such opportunity was given. Despite what appears to have been nearly unanimous public opposition, the council voted four to one in favor of granting the franchise to HUB.

In February 2001, the franchise went into effect. That month, HUB began making campaign donations in Compton and neighboring cities that totaled some $270,000. HUB's payments were made directly and exclusively from revenues generated by the company's franchise with Compton. Ten thousand dollars was donated in February 2001, to a campaign committee for Mayor Bradley. An additional $12,000 was donated to Bradley's committee in March of 2001, $10,000 in April, and $11,000 in May. In 2002 and 2003, HUB donated $12,000 to the campaign committee of Councilmember Rahh. Five thousand dollars was donated to the committee of Councilmember Zurita in 2002, and $10,000 in 2003. During these reporting periods, HUB was the largest contributor to both Rahh and Zurita. No donation was given to the council member who voted against the franchise.

As appellants claim, there is no evidence of an express agreement showing that the donations were made in return for the votes of council members in favor of the franchise agreement. But there is sufficient evidence for a reasonable jury to find that the votes in favor of the agreement were cast in anticipation of the contributions, and the payments were made on account of them. The council members approved the deal even though the city had only recently brought its waste management in-house, and a majority of the public who spoke at the city council hearing opposed the franchise. The donations, particularly those to Bradley's committee, were made close in time to the council's approval of the franchise, and constituted substantial portions of the council members' campaign funds. (Cf. *BreakZone Billiards, supra,* 81 Cal.App.4th at pp. 1215–1216.)

 HUB's employment of relatives of Bradley and Zurita provided further evidence of those individuals' personal interest in the franchise agreement. Employment of an official's relatives may constitute a prohibited interest under section 1090. (See *People v. Honig, supra,* 48 Cal.App.4th at p. 319 [finding employment and remuneration of official's wife by nonprofit organization benefiting from government contract a financial interest].) Evidence was presented that at least one of the relatives hired by HUB was unqualified. City staff member Kareemah Bradford testified that, the week after the franchise went into effect, Aloyan asked her to train Bradley's cousin and Zurita's daughter, Janna Zurita, for a community affairs position at HUB. After speaking with Janna Zurita, Bradford refused, telling Aloyan that she would not train unqualified relatives of city council members. Subsequent to her conversation with Aloyan, Bradford was transferred to a city position where she had no duties, and was later returned to her position after filing a grievance.

Evidence of Aloyan's prior acts showed the campaign contributions were part of his design or plan to influence public officials to award government contracts to his businesses. When working at a waste management company called Murcole in the 1990's, Aloyan delivered a campaign contribution to the then mayor of Compton to elicit that official's support for a rate hike for Murcole. Aloyan testified against the mayor at the mayor's criminal trial under a grant of immunity from the federal government. About the same time, Aloyan was involved with a company called Compton Entertainment, Inc., which lobbied the Compton city council to support its opening of a card club and casino in that city. Aloyan gave a campaign contribution on behalf of the company to a council member who was generally opposed to gambling in the city. The council member had said she would "kill the project" unless Compton Entertainment, Inc., gave her money. She left the council without voting on the project, and Aloyan testified about her extortion at a criminal trial in 1996 under a grant of immunity. In 2002, Aloyan gave a Carson city council member a $10,000 payment in exchange for the council member's

support for HUB's solid waste disposal contract with that city; this payment led to Aloyan's conviction for attempted bribery for which he served five months in a federal prison camp. (We discuss admissibility of these other acts in the next part of this opinion.)

Taken together, the facts give rise to the inference that the campaign contributions from HUB constituted prohibited financial interests. A reasonable person could conclude that the city council members and Bradley considered and approved the franchise agreement with HUB because they stood to benefit financially from its execution. While the evidence does not preclude other inferences, we must indulge every reasonable inference in support of the verdict. (*People ex rel. Brown v. Tri-Union Seafoods, LLC, supra,* 171 Cal.App.4th at p. 1567.) The record shows that the jury could have reasonably found that the franchise agreement violated section 1090.

Appellants argue that the plain language of section 1090 requires a prohibited financial interest to be "in" the contract, not ancillary to it. They contend that this means that "bribery is not an interest in the agreement under section 1090." This is not a correct reading of the law. (See *Carson Redevelopment Agency v. Padilla, supra,* 140 Cal.App.4th at p. 1334 ["[S]ection 1090 applies even when a public official's financial interest flows from a source that is independent of a public contract."]; *Klistoff v. Superior Court, supra,* 157 Cal.App.4th at p. 480 [" '[S]ection 1090 is aimed at *any* interest, other than an interest that is too remote or speculative, that could compromise a public official's judgment or cast doubt on whether he executed his duties with the utmost allegiance, diligence, and loyalty to his office.' "].) Further, the evidence in this case does not support appellants' contention because the contributions received by the council members were paid directly from the franchise proceeds.

### III

Appellants claim the trial court erred in admitting evidence about Aloyan's past involvement with payments to Compton city council members and members of the Carson city council, and Burke's testimony about his conversation with Aloyan. The court found this evidence was "admissible to demonstrate a common plan or scheme, as well as to prove Mr. Aloyan's knowledge, motive and intent, i.e., to influence government action for Mr. Aloyan's benefit." It also found the probative value of the evidence outweighed any prejudicial effect. We review the court's rulings for abuse of discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639–640 [92 Cal.Rptr.2d 115].)

Evidence Code section 1101 (section 1101) provides, in pertinent part: "(a) Except as provided in this section . . . evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, [or] identity . . .) other than his or her disposition to commit such an act." The relevance of uncharged misconduct to show intent or the existence of a common design or plan is determined by the nature and degree of the similarity between such misconduct and the charged conduct. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018 [80 Cal.Rptr.2d 676].)[7] The least degree of similarity is required to prove intent, and a greater degree is required to prove the existence of a common design or plan. (*Scheer*, at p. 1018.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to evidence in the present case to support the inference that the defendant would have harbored the same intent in each incident. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393–394 [27 Cal.Rptr.2d 646, 867 P.2d 757].) To establish a common design or plan, evidence of uncharged misconduct must demonstrate a concurrence of common features indicating the existence of a plan rather than a series of similar spontaneous acts. (*Brown v. Smith, supra*, 55 Cal.App.4th at p. 790.)

We first discuss the evidence showing that Aloyan had participated in paying city officials in Compton and Carson in connection with public contracts. Appellants argue the prior acts involved extortion, not bribery. But the characteristics of each episode are similar. In each, Aloyan participated in payments to city officials in connection with a public contract. Although two prior acts involved campaign contributions and one involved a cash payment, all three were made by Aloyan for the purpose of influencing an official's vote on a matter regarding a business venture in which he had a pecuniary interest. The prior acts and charged conduct are sufficiently similar to support the inference that Aloyan harbored the same intent in each instance: to obtain government contracts through payments to public officials.

There are sufficient common features between Aloyan's past conduct and HUB's campaign contributions to meet the higher standard of similarity required to show the existence of a common plan or design. (*People v. Scheer, supra*, 68 Cal.App.4th at p. 1018.) The evidence showed that Aloyan's uncharged conduct was not a spontaneous series of events. One payment was made to obtain a rate hike for a waste management contract; another was

---

[7] "The same evidentiary rules apply in both civil and criminal case[s] concerning evidence of other uncharged misconduct." (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 790, fn. 15 [64 Cal.Rptr.2d 301].)

made to secure a contract between HUB and the City of Carson. The uncharged misconduct and appellants' alleged activities in this case demonstrate considerable similarity. The trial court did not abuse its discretion in admitting the evidence under section 1101, subdivision (b).

Aloyan's conversation with Burke showed that Aloyan planned to influence Compton officials to grant him a franchise for the city's waste management services even as Aloyan was managing Compton's in-house waste division. It was probative of the charged conduct that Aloyan made the franchise agreement while acting in his official capacity under section 1090. Aloyan's statement to Burke that he planned to advise other cities to internalize their waste management unless Burke agreed to purchase AUS was admissible to show that Aloyan planned and intended to influence government action for his benefit. Burke's testimony does not constitute character evidence and is not subject to exclusion under section 1101.

Appellants argue this evidence should have been excluded under Evidence Code section 352, because its probative value was outweighed by undue prejudice. The section provides in pertinent part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) The evidence was prejudicial because it showed that Aloyan had previously gained, or attempted to gain, government contracts by paying public officials. But the probative value of the evidence was high. Appellants argued that the campaign contributions to Bradley, Rahh, and Zurita did not constitute a quid pro quo for those council members' support for HUB's franchise proposal. The prior acts evidence refutes that argument by supporting the inference that the contributions were in exchange for Compton's franchise agreement with HUB. Neither was the evidence of undue prejudice. The prior acts were no worse than the conduct alleged in this case. Further, the trial court instructed the jury to only consider Aloyan's felony conviction as evidence of "motive, intent, plan, knowledge or pattern and practice."[8] We find no abuse of discretion in the court's determination that whatever prejudicial effect the evidence may have had did not clearly outweigh its probative value. We also are satisfied that even if the admission of the evidence was error, it is not reasonably probable that a result more favorable to appellants would have been reached in its absence. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 939 [22 Cal.Rptr.3d 530, 102 P.3d 915].) As we have discussed, there was strong and ample evidence supporting

---

[8] While appellants argue against any bad act evidence being introduced, they do not argue that the jury should have been instructed to consider only the activities leading to the conviction, not the conviction itself.

the jury's finding that the franchise agreement was made in violation of section 1090.

## IV

██ Appellants argue that disgorgement was not the appropriate remedy because it would provide a windfall to Compton and adversely impact HUB's "innocent third-party creditors." This claim fails because it ignores consistent appellate case law holding the disgorgement remedy is automatic for civil liability under section 1090. (See *Carson Redevelopment Agency v. Padilla, supra*, 140 Cal.App.4th at p. 1336.)

██ Government Code section 1092 provides, in pertinent part: "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein." A public entity is entitled to recover any compensation it paid under a tainted contract without restoring any of the benefits it received. (*Carson Redevelopment Agency v. Padilla, supra*, 140 Cal.App.4th at p. 1336, citing *Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 583 [110 Cal.Rptr.2d 552].) Disgorgement is "consistent with the policy of strict enforcement of conflict-of-interest statutes, [and] it provides a strong disincentive for those officers who might be tempted to take personal advantage of their public offices . . . ." (*Thomson v. Call* (1985) 38 Cal.3d 633, 652 [214 Cal.Rptr. 139, 699 P.2d 316].) It was appropriately applied here.

## V

We do not reach appellants' claim that the judgment should be reversed because the jury did not render a special verdict. There was sufficient evidence supporting section 1090 liability under either theory advanced by Compton; the absence of a special verdict specifying which theory the jury relied upon in reaching its verdict is therefore not relevant to our decision.

Appellants argue that, if we were to reverse the judgment, we also should reverse the summary adjudication of Compton's cause of action for declaratory relief and the grant of nonsuit on appellants' complaint. Because we affirm the judgment finding appellants liable under section 1090, we do not reach their contentions that the termination of the franchise by Compton constituted a breach of contract, or that the absence of a mayoral signature did not affect the validity of the franchise agreement.

## DISPOSITION

The judgment is affirmed. Compton to have its costs on appeal.

Willhite, J., and Suzukawa, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 20, 2010, S185909.