Filed 12/3/15  Lin v. Central Escrow CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CHUN LIN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CENTRAL ESCROW, INC.,<br><br>    Defendant and Respondent. | B257695<br><br>(Los Angeles County<br>Super. Ct. No. GC050349) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Donna Fields Goldstein, Judge.  Affirmed.

Law Offices of James T. Duff and James T. Duff for Plaintiff and Appellant.

Hershorin & Henry and Lori Hershorin; and Maurice K. Wong for Defendant and Respondent.

\* \* \* \* \* \* \* \* \* \*

This lawsuit arises out of a real estate transaction in which plaintiff Chun Lin and his wife (buyers) attempted to buy property located in Arcadia from 330 Naomi LLC (seller). Buyers deposited 10 percent of the purchase price of the property with defendant Central Escrow, Inc. (escrow), first depositing 3 percent of the purchase price, and later depositing the remaining 7 percent.

The parties entered into a separate agreement to release the 3 percent deposit to the seller. Later, relying on language in the parties' purchase agreement (and addenda thereto), the escrow released buyers' entire down payment to the seller, before the close of escrow. Due to buyers' financial problems, escrow never closed.

Seller filed for bankruptcy, and buyers filed a creditors' claim for the return of 70 percent of their down payment in bankruptcy. After receiving only partial payment from the bankruptcy estate, plaintiff Chun Lin sued the escrow in this action to recover the remainder of the funds, claiming that the escrow breached the escrow instructions by releasing 70 percent of his down payment before the close of escrow. The trial court concluded that the parties had agreed to an early release of the funds, and therefore entered judgment for the escrow. Finding substantial evidence supports the judgment, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts were adduced during the court trial. On October 9, 2008, buyers executed a standard California Association of Realtors (CAR) Residential Purchase Agreement and Joint Escrow Instructions (purchase agreement), making an all cash offer to purchase the property for $2,800,000. Buyers were represented by an agent, Sou Ling Yin of Masters Realty. Ms. Yin prepared the purchase agreement and its addenda, and explained its contents to buyers (who were residents of China) in Mandarin Chinese.

The purchase agreement provided that escrow would be opened with an initial deposit of 3 percent of the purchase price, or $84,000, within three days of seller's acceptance. The contract also called for an "increased deposit" of $196,000 (representing 7 percent of the purchase price), to be deposited with the escrow within 20 days of

2

seller's acceptance of the offer.  The agreement also provided that buyers would have 20 days from acceptance of the offer to complete their investigations of the property and to remove any contingencies.  The balance of the purchase price would be deposited within a sufficient time to close escrow.  Escrow was to close on February 28, 2009.  Because buyers were making an all cash offer, there was no loan contingency.  The agreement also included a standard liquidated damages provision, calling for damages of 3 percent of the purchase price in the event of buyers' default.  The purchase agreement also provided that contingencies, and their removal, were not to be monitored by the escrow.

The purchase agreement included an addendum (addendum one) that provided "1.  Escrow Closing Date Shall Be On or Before Feb. 28, 2009," and that "2. Buyers will Pay 3% Initial Deposit to Open Escrow."  The addendum also provided that "3.  Buyers will remove all contingencies and release Remaining 7% of the 10% Downpayment 20 days after acceptance.  [¶]  4.  After buyers remove all contingencies . . . buyers would like to start the upgrades including swimming pool, landscaping, interior at buyers' cost with seller's approval and builder approved contractors."  The purchase agreement also included another addendum (addendum two) which specified a number of items needing repair on the property.

On October 13, 2008, seller, represented by Robert Ho of Long Dragon Realty, made a counteroffer (counteroffer one) with a proposed purchase price of $3,280,000, or $3,230,000 if escrow could be closed within 30 days after acceptance.  Seller signed the purchase agreement and addendum one, subject to acceptance of its counteroffer.  Seller did not sign addendum two.  Buyers did not accept seller's counteroffer.

Having rejected seller's counteroffer, on December 21, 2008, buyers submitted a counteroffer to seller (counteroffer two), offering a $10,000 increase to the purchase price ($2,810,000).  The counteroffer also provided that:  "Escrow Closing Date Shall Be On or Before Feb. 28, 2009[.]  [¶]  Buyers Will Pay 3% Initial Deposit to Open Escrow[.] [¶]  Buyers Will Remove all Contingencies and Release the Remaining 7% of the 10% Downpayment 20 Days after Acceptance."  Counteroffer two omitted the language from

3

addendum one about the buyers making upgrades to the property. However, the standard CAR form provided that the counteroffer simply modified the October 13 purchase agreement. Seller signed counteroffer two on January 6, 2009.

The purchase agreement designated Central Escrow, Inc., as the escrow holder. Ms. Samantha Ma acted as the escrow officer for the transaction. On January 6, 2009, buyers and seller signed "Supplemental Escrow Instructions to Residential Purchase Agreement and Joint Escrow Instructions Dated October 9, 2008" that were authored by the escrow. The supplemental escrow instructions acknowledged receipt of the purchase agreement, addendum, and two counteroffers, dated October 13, 2008 and December 21, 2008, and provided that these documents formed the entire agreement between buyers and seller, and constituted the instructions to the escrow. The supplemental instructions provided that "Buyer will hand Central Escrow, Inc. initial deposit in the amount of [$]84,300.00. Buyer will hand you additional deposit by January 9, 2008 [*sic*]. [$]196,700.00." The agreement also provided that the escrow could accept oral instructions from the parties' brokers, but could not act on these instructions until they were reduced to writing and signed by all parties to the escrow.

Buyers wired $83,985 to the escrow on January 20, 2009, even though the purchase agreement required the deposit to be made by January 9. Because the initial deposit was late, on January 27, 2009, one of the seller's agents wrote to the escrow officer, Samantha Ma, stating "We need an amendment stating that escrow deposit to be release[d] to seller today and please fax a copy to buyer['s] agent, seller . . . and seller['s] agent. . . . [¶] This needs to be done immediately so we can get the buyer [to] sign today and have the money release to seller at once."

On January 26, 2009, the escrow prepared "Amended Escrow Instructions" providing, in pertinent part: "EARLY RELEASE OF FUNDS TO SELLER: Provided Escrow holder is in receipt of signed escrow instructions from all parties and clearance of all funds on deposit. Escrow holder is hereby directed to release immediately the sum of $84,300.00 to the Seller. Said funds shall be applied toward the purchase price at close of escrow. Advanced funds are NON-REFUNDABLE to Buyer if escrow is not

4

consummated (unless such failure is due to default of Seller), and Escrow Holder is herein released from all liabilities." The amendment also provided that the Terms of Sale from the original instructions were amended as follows: "Buyer will hand Central Escrow, Inc. initial deposit in the amount of [$]84,300.00. [¶] Buyer will hand you additional deposit by February 15, 2009 . . . [$]196,700.00." The amended instructions made no mention of extending the date for the removal of contingencies. The closing was extended until March 31, 2009. Both parties signed the amended instructions.

On January 29, 2009, buyers submitted a Request for Repairs (which specified a number of repairs which had been requested in an original addendum (addendum two) to the purchase agreement), and requested a credit of $100,000. The "seller's response" portion of the CAR form indicated that "Seller agrees to walk through with buyer and/or their property inspector of buyer's requests and do the reasonable and necessary repairs after [it] receive[s] the second released fund of $196,700." Seller did not sign its response, and buyers did not further respond or provide an additional signature.

On March 24, 2009, a Verification of Property Condition (Buyer Final Inspection) was deposited with the escrow, providing that the seller had completed all the repairs contemplated by the parties, except that the "driveway is not acceptable." Buyers requested replacement of the driveway or a $10,000 credit. The verification did not alter the obligations of the buyers or seller concerning the condition of the property. Moreover, the verification explicitly provided that a "final inspection is not a contingency of the purchase and sale."

On February 17, 2009, buyers wired $196,985 (the remaining 7 percent of their down payment) to the escrow. Beginning on February 24, 2009, the escrow made a number of disbursements from the deposited funds to third parties identified by the seller. For example, on February 24, 2009, escrow made a payment of $100,000 to American Continental Bank on behalf of the seller. The buyers did not immediately receive notice of these disbursements.

Escrow did not close on March 31, 2009, as contemplated by the amended escrow instructions, because buyers had financial difficulties and were unable to deposit the

remainder of the purchase price into escrow. On May 12, 2009, Ms. Ma wrote to buyers to inform them that the escrow had released $204,902 of the funds deposited into escrow to the seller "in accordance with item #3 of the Addendum number one (1) dated October 9, 2008, and the Amended Escrow Instructions dated January 26, 2009 by all parties."

Also on May 12, 2009, seller signed Amended Escrow Instructions purporting to indemnify the escrow, providing that "In accordance with item #3 of the Addendum dated October 9, 2008 (the release of 70% of the downpayment to the Seller 20 days after acceptance), Seller herein, by execution of these instructions, does hereby agree to indemnify, hold harmless and defend the Escrow Holder from and against any claims, damages, losses and expenses, including attorney's fees and costs which may arise or incur by reason of Escrow Holder complying with the foregoing instructions, at and after the close of escrow. In the event this escrow is not consummated Escrow Holder shall not be held liable, nor requested, to aid in the recovery of said funds. Any return of funds shall be handled OUTSIDE OF ESCROW." This agreement had no signature block for the buyers, and was not communicated to the buyers.

After May 12, the escrow made additional disbursements from buyers' deposited funds, including a May 13, 2009 payment of $74,292.87 to seller. In addition to the $84,300 paid to seller (per the January 26, 2009 amended escrow instructions), the escrow disbursed $196,700 of buyers' deposited funds.

Because buyers were unable to provide the remainder of the purchase price, Ms. Ma prepared instructions to cancel the escrow. However, the parties were unable to agree on the cancellation instructions.

At trial, Ms. Ma testified that she understood that the "release" language in addendum one and counteroffer two of the parties' purchase agreement authorized the early release of 7 percent of the purchase price to the seller. She testified that "both agents instructed me, because we verified these terms on the addendum and counteroffer with them. They told me that item no. . . . 3 on the addendum and item no. 4 on the counteroffer no. 2 is one phrase, one breath, one sentence. [¶] . . . It says: [¶] Buyer

6

will remove all contingencies, and when the money come[s] into escrow, the buyer deposit 7 percent into escrow, and when escrow see the money and that's the time the buyer has removed all the contingencies and it's ready to be released." Both agents explained to Ms. Ma that the written contracts provided that buyers' deposited funds were to be released to the seller before the close of escrow.

The buyers' agent, Ms. Yin, denied making these statements, and testified that the term "release" meant that the funds would be deposited with the escrow, not released to the seller. Ms. Yin testified that the seller was supposed to receive the remaining 7 percent of the down payment after close of escrow. Plaintiff, Mr. Lin, testified that he did not understand the contract to authorize early release of the entire 10 percent down payment to the seller. However, the seller's agent, Mr. Ho, testified that he understood the parties agreed to provide for the early release of deposited funds to the seller because of the length of the escrow, and because of the price cut the seller agreed to. He confirmed his understanding with the buyers' agent.

The trial court issued a lengthy statement of decision, concluding that addendum one to the purchase agreement provided for the "release of the remaining 7% of the 10% down payment 20 days after the [seller's] acceptance." Moreover, according to Ms. Ma, agents for the buyers and seller had explained to her that the agreement contemplated the early release of the deposited funds to the seller. The court concluded that the use of the word "release" in the addendum, rather than "deposit," "is most reasonably interpreted to mean the release to the seller from escrow of the 7% deposited by the buyer. Any other interpretation renders the instructions unduly vague." The court found that the dictionary defined "deposit" to mean "to lodge for safekeeping; state of being deposited in trust and safekeeping; something entrusted to the care of another" while "release" was defined as "to set free from restraint; to let go or give up; to remove the obligation of; and in law, to discharge or relinquish a right to." The court concluded that the seller and the escrow interpreted the term "release" to call for the early release of funds to the seller, and that because the buyers drafted the contract, any ambiguity should be construed against the

7

buyers. Accordingly, the court concluded that the escrow followed the escrow instructions, and incurred no liability to plaintiff.

Plaintiff timely appealed.

## DISCUSSION

Plaintiff contends the trial court's interpretation of the term "release" is not supported by substantial evidence. He also contends that the agreements containing the "release" term were superseded by the January 26, 2009 amended escrow instructions, which made no mention of releasing funds before the close of escrow. Lastly, he contends the escrow breached its fiduciary duties when it entered into an indemnity agreement with seller, and released buyers' additional deposit to seller, all without notice to the buyers. We find no merit in any of these contentions.

## I. Standard of Review

If escrow instructions are in writing, an action for failure to comply with the instructions is for breach of contract. (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 531-532.) In construing a contract, "[w]hen no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. . . . When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955-956, citations omitted.) When a trial court's findings of fact are challenged on appeal, we apply the deferential substantial evidence standard of review. (See *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128-1129.) The appellate court presumes the judgment is correct, and accepts as true the trial court's resolution of conflicts in the evidence. (*Estate of Falco* (1987) 188 Cal.App.3d 1004, 1018.)

Because construction of the parties' agreement turned on disputed extrinsic evidence concerning the meaning of the term "release" in addendum one and counteroffer two, and because plaintiff challenges the sufficiency of the evidence in support of the

8

judgment on appeal, we review the trial court's construction of the contract for substantial evidence.

## II. Analysis

An escrow involves the deposit of documents, money, or both with a third party to be delivered upon the occurrence of some condition. (Fin. Code, § 17003, subd. (a); *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711 (*Summit*).) An escrow holder's "limited role in the transaction is as an agent who ' "carries out the escrow instructions." ' . . . [¶] An escrow agent's role ends once he or she has successfully exchanged payments and instruments, and he or she 'has no general duty to police the affairs of its depositors.'" (*Paul v. Schoellkopf* (2005) 128 Cal.App.4th 147, 154 (*Schoellkopf*), citations omitted; see also *Summit*, *supra*, at p. 711.) Generally, an escrow holder " 'incurs no liability for failing to do something not required by the terms of the escrow or for a loss caused by following the escrow instructions. [Citation.]' " (*Summit, supra*, at p. 715.)

The usual rules of contract interpretation apply to determine what the parties intended when they entered into the escrow. (*Schoellkopf*, *supra*, 128 Cal.App.4th at pp. 153-154.) " ' "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)' . . . A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." ' " (*TRB Investments, Inc. v. Fireman's Fund Ins. Co*. (2006) 40 Cal.4th 19, 27, citations omitted.) If contractual language is susceptible to more than one reasonable interpretation, extrinsic

9

evidence may be admitted to resolve the ambiguity. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709-1710.)

The trial court considered extrinsic evidence to construe the parties' agreement, and plaintiff does not argue on appeal that the trial court erred in resorting to extrinsic evidence to aid in its interpretation. We find that substantial evidence supports the trial court's construction of the term "release" to mean that the additional deposit would be released to the seller in advance of the close of escrow. Both Ms. Ma and Mr. Ho testified that the contract provisions meant that deposited funds were to be released to the seller within 20 days after the seller's acceptance of buyers' offer to purchase the property, in advance of the close of escrow. Although this interpretation was disputed by plaintiff (plaintiff and his agent testified that they did not ascribe this meaning to the contract provision), we find substantial evidence supports the trial court's conclusion. The buyers required a lengthy escrow in order to obtain the purchase funds, notwithstanding the fact that they made an all cash offer that was not contingent on obtaining financing. Moreover, when they entered the purchase agreement, the buyers sought to make improvements to the property before the close of escrow. Under these conditions, it was reasonable to credit Mr. Ho's testimony, and the testimony of Ms. Ma, that the parties anticipated the early release of the deposited funds.

Plaintiff argues the supplemental escrow instructions signed by the parties on January 6, 2009 made no mention of the release of funds to the seller, and therefore superseded the language in the addendum and counteroffer to the purchase agreement. The supplemental escrow instructions simply set forth dates and the amounts of funds to be deposited with the escrow. They did not mention the "release" of funds to the seller. However, the "supplemental" instructions incorporated and supplemented the parties' purchase agreement, addendum, and counteroffer; they did not supplant the parties' earlier agreement, as the provisions were not inconsistent. (See, e.g., *Frangipani v. Boecker* (1998) 64 Cal.App.4th 860, 863.)

Plaintiff also argues that the purchase agreement did not identify who the funds would be released to, and therefore the trial court's conclusion that the parties agreed the

funds would be released to the seller is not supported by substantial evidence. The purpose of an escrow is to hold funds or documents in trust until the satisfaction of some condition, and then to release those funds or documents to the intended recipient. (Fin. Code, § 17003, subd. (a).) Clearly, the purchase money deposited in escrow was deposited there for the benefit of the seller. The trial court, based on the testimony of Ms. Ma and Mr. Ho, could logically conclude that the parties intended the funds to be released to the seller.

We are also not persuaded that the January 26, 2009 amended escrow instructions, authorizing the early release of the first 3 percent of the buyers' deposit (but silent as to the remaining 7 percent), compel a finding that the remaining 7 percent was not subject to early release. First, at the time these amended instructions were signed by the parties, the remaining 7 percent of the purchase price had not yet been deposited with the escrow. Moreover, the language of the parties' purchase agreement (and addendum and counteroffer) did not authorize the release of the first 3 percent of the down payment, which the agreement characterized as a "deposit." Therefore, the clarification provided by the January 26 instructions that the first 3 percent was to be released to seller was clearly warranted. There was no need to also state in the January 26 amended escrow instructions that the additional 7 percent was to be released to seller, as this was expressly authorized by the parties' agreement.

We turn briefly to plaintiff's argument that the escrow breached fiduciary duties owed to plaintiff. Plaintiff did not assert a cause of action for breach of fiduciary duty, but the trial court, in effect, amended the complaint on its own motion to add that cause of action, which the escrow does not assert as error on appeal. The same substantial evidence that supports the judgment for the escrow on the breach of contract claim also supports the judgment for the escrow on the breach of fiduciary duty claim. Plaintiff argues the escrow breached its fiduciary duty by failing to notify and provide plaintiff with a copy of the indemnity agreement between the escrow and seller. Plaintiff offers no argument or authority to demonstrate how the failure to disclose and provide him with a copy of the indemnity agreement caused him to suffer any damages. In the absence of

any cogent argument or citation to the record demonstrating causation, we find no basis on which to conclude the trial court erred by finding no breach of fiduciary duty.

Accordingly, we find no error in the trial court's judgment.

## DISPOSITION

The judgment is affirmed.  Respondent is to recover its costs on appeal.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.