KRIEGLER, J., Dissenting.
I respectfully dissent.
My colleagues reverse the judgment on the theory the evidence is insufficient as a matter of law to establish that the damages suffered by the buyer were foreseeable. I disagree and would hold, after viewing the evidence in the light most favorable to the judgment, that the issue of foreseeability was properly left to the jury’s determination.
The escrow company breached an agreement with the buyer to secure his funds by a specified date, leaving the funds with an intermediary. Whether the intermediary’s bankruptcy was foreseeable to the escrow company based on the facts and circumstances of this case is a question on which reasonable minds can differ, making it an appropriate issue for the jury to decide. There is sufficient evidence to support the jury’s determination that the bankruptcy and the buyer’s damages were foreseeable to the escrow company. The seller breached the agreement as well, by failing to meet the escrow deadline, although the jury found the majority of the buyer’s damages (including the tax consequences) were not foreseeable to the seller. However, the jury’s finding that some of the damages were foreseeable to the seller as a result of missing the escrow deadline is supported by substantial evidence.
*1280 I agree with the majority opinion that a superseding cause instruction was warranted with respect to the tort actions against the escrow company. However, in light of the arguments at trial and the jury’s findings, I do not believe it is reasonably probable that the jury would have come to a different result if the instruction had been given.
FACTS AND PROCEDURAL BACKGROUND
Our duty on appeal is to view the facts in the light most favorable to the judgment. (Hub City Solid Waste Services, Inc. v. City of Compton (2010) 186 Cal.App.4th 1114, 1128-1129 [112 Cal.Rptr.3d 647].) Because my view of the facts supporting the judgment differs significantly from the majority, I set forth the facts in accordance with the standard of review.
I. Property Purchase Agreement
Plaintiff and appellant David Ash, as trustee of the David Ash Trust dated January 10, 2008, owned commercial property on Wilshire Boulevard. He entered into an agreement to sell the Wilshire property on September 8, 2008. His brokers and accountant said he could defer capital gains tax under Internal Revenue Code (26 U.S.C.) section 1031 (section 1031) by using the proceeds to purchase a replacement property. Ash researched tax deferred exchanges. Under section 1031, he was required to place the sale proceeds with a qualified intermediary, identify a replacement property within 45 days, and complete the purchase within 180 days. Ash intended to use TIMCOR Exchange Corporation 1031, a subsidiary of Washington Mutual, as the intermediary, because it was the most familiar company.
Ash found a commercial property for sale on Venice Boulevard that fit his needs. The property was owned by defendants and appellants Richard Lemer, as trastee of the Lemer Family Trust, and Richard and Gloria Lerner, as trustees of the Exemption Trust of the Lemer Family Trust (collectively Lemer).[1]
Ash submitted a purchase offer for the Venice property on September 29, 2008. Lemer’s counteroffer on October 6, 2008, signed by Richard, stated that the seller was “Lemer Family Trust” and provided Lerner the right to select the escrow holder. Ash accepted the counteroffer on October 8, 2008, and delivered a deposit of $50,000.
Ash could not use TIMCOR as an intermediary, however, because Washington Mutual had declared bankruptcy in the interim and closed *1281 operations. Ash spoke with brokers and selected qualified intermediary LandAmerica 1031 Exchange Services, Inc. He arranged for LandAmerica to receive the sale proceeds from the escrow on the Wilshire property and place them in a segregated account held by LandAmerica for Ash’s benefit. LandAmerica prepared an agreement for the transaction dated October 8, 2008.
Lerner’s real estate agent was Rick Rivera at Centers Business Management (CBM). Rivera selected defendant and appellant North American Title Company (NAT) to provide escrow services and title insurance. NAT title officer Victor Greene prepared a preliminary title report for the Venice property dated October 10, 2008, which he sent to CBM. The report stated that title to the property was held as follows: a 50 percent interest held by Barbara Simkin, Bernard David Lemer, Richard Scott Lemer, Gloria Lee Lemer, and Irving Reifman as trustees of the Ray Lemer Irrevocable Tmst; and a 50 percent interest held by Barbara Simkin, Bernard David Lerner, Richard Scott Lemer, and Gloria Lee Lerner as trastees of the Exemption Trust of the Lerner Family Trust dated November 17, 1986. The report included a form that Lemer needed to complete to certify that the signatories had authority to act for the tmst.
Rivera contacted NAT escrow officer Maria Jennings on October 13, 2008, to act as the escrow officer. Jennings prepared escrow instructions on October 17, 2008, which identified the seller as “The Lemer Family Trust” and stated the expected closing date for escrow was November 21, 2008.
Richard decided to record a note and deed of trust on the Venice property to secure a debt that Lemer owed to a third party. He would use the sale proceeds to pay off the note. Paying the debt through escrow would provide tax benefits to Lemer. Richard arranged for his attorney, James Fisher, to manage the transaction. Attorney Fisher did not know the' escrow deadline.
Richard also planned to defer Lemer’s capital gains tax on the sale through a section 1031 exchange. On November 4, 2008, CBM’s in-house attorney, Jeffrey Adelman, wrote an e-mail to Richard stating, “So that we avoid the vesting issues we had to clean up at [two other properties], please confirm EXACTLY how title is held for [the Venice property] and EXACTLY who will be doing a [section] 1031 exchange.” Richard asked him to send information showing the recorded title for the Venice property.
On November 5, 2008, Ash removed all of the buyer contingencies and instructed NAT to meet the escrow deadline. Lemer learned that Ash planned to get a loan from US Bank for part of the purchase price.
On November 6, 2008, Jennings alerted Rivera that vesting information was required for the property. Rivera asked her to identify the necessary *1282 information. Jennings replied that the title to the property reflected two trusts, so NAT needed copies of the trust agreements and all amendments, a confirmation that Richard had authority to sign on behalf of both trusts, and death certificates for previous trustees. Rivera e-mailed NAT’s request to Richard.
Richard responded that his mortgage broker Barry Weinstock had handled vesting information five times previously, and Attorney Fisher had replaced one of the former trustees. Richard requested that Attorney Fisher send certain documents to Rivera, and that Rivera obtain the rest of the information from Weinstock.
Escrow closed on Ash’s Wilshire property and the sale proceeds were deposited with LandAmerica in the segregated account for Ash’s benefit. After Ash had entered into the agreement with LandAmerica, he developed concerns about LandAmerica’s financial viability. The banking system was collapsing and Ash was afraid of the state of the entire industry. He needed the income from the Venice property. He wanted to move forward as quickly as possible to get the income and be protected.
Ash could not direct LandAmerica to transfer his funds to the Venice property escrow without violating the section 1031 exchange requirements. On November 12, 2008, Ash asked LandAmerica employee Sarah Blankenship to communicate with Jennings to transfer $120,000 to escrow. Ash also instructed Jennings to demand the wire transfer from LandAmerica. On November 13, 2008, Blankenship and Jennings exchanged documents by e-mail, including wiring instructions. Blankenship transferred $120,000 into escrow that day. LandAmerica was already holding the sale proceeds in accordance with the intermediary agreement dated October 8, 2008, when Ash finally signed the agreement on November 13, 2008.
Weinstock provided some of Lemer’s vesting information on November 14, 2008, which Jennings forwarded to Greene on November 17, 2008.
On November 19, 2008, two days before escrow was scheduled to close, US Bank employee Robert Kaempen delivered the following to NAT on Ash’s behalf: cashier’s checks totaling $842,000, a deed of trust, a document verifying that Ash was the sole authorized trastee of the Ash Trust, and amended escrow instructions directing NAT to record the deed of trust before the close of escrow. Ash began accruing interest on the loan at the rate of $500 per day.
That same day, Ash repeatedly asked Jennings to request the rest of the purchase funds from LandAmerica, which she confirmed that she would do. *1283 Ash told Jennings several times that he needed the income from the Venice property, wanted to get the escrow completed, and wanted to have his funds safely reinvested.
Ash’s real estate broker Robert Laswell spoke with Jennings in the late afternoon. She told him that all the funds were in. He believed NAT had received Ash’s funds from LandAmerica and escrow would close a day early.
On the afternoon of November 19, 2008, Attorney Fisher spoke to Jennings for the first time. He said he would be giving her two deeds of trust securing notes payable to third parties which he wanted recorded prior to the close of escrow. Jennings told him to get the deeds of trust to her by 3:30 p.m. the next day, if he wanted them recorded by Friday. Jennings agreed to prepare payoff demands, escrow instructions, and an acknowledgement. In an e-mail confirming their responsibilities, Attorney Fisher referred to “the escrow tentatively scheduled to close the following week.” Jennings opened a separate escrow for Lemer’s transaction with the third party.
On the morning of November 20, 2008, Jennings gave Attorney Fisher’s contact information to Greene. Greene said he was reviewing Lemer’s trust documents and they probably would need additional information.
Before noon on November 20, 2008, Richard sent an e-mail to Rivera in which he expressed regret if the third party transaction delayed the escrow closing. He added, “It is my fault because I thought the escrow was not closing until the end of the month. I will do my best to urge [Attorney Fisher] to expedite his matters.”
LandAmerica needed an estimated closing statement from Jennings stating the amount to transfer. Shortly after noon, Ash sent an e-mail to Jennings asking if she had received his funds from US Bank. “If so, is it possible to get me something so I can ask LandAmerica to wire you the remaining balance?”
Attorney Fisher, Jennings, and Greene continued to exchange documents and instructions about Lemer’s transaction with the third party. Jennings wrote an e-mail to Ash, “I got the funds today, I am working on your file exclusively today. I will have an estimate for you shortly. I am working on some last minute things for the Seller that is going to delay us a bit. I will keep you posted on how that is all progressing. I am thinking that we are going to be pushed to Monday or Tuesday of next week.” Ash responded, “no problem do I get a discount[@] (jk).” However, in a later telephone conversation, Jennings said escrow would not close on time and Ash said he was not approving a delay. Jennings said she would see what she could do to get it done.
*1284 Jennings prepared and e-mailed documents for the third party to sign. At 4:15 p.m., Jennings sent an e-mail to Rivera explaining that attorneys in the third party transaction were reviewing documents. She said she had told Richard that every day the deeds of trust were not recorded pushed the escrow closing one day later. She told Richard and Attorney Fisher that if they wanted the deeds of trust recorded the next day, she needed them by 3:30 p.m., but they had not been delivered. She added, “Richard asked me if all these last minute issues were preventing this escrow from closing tomorrow and I respectfully told him ‘Yes.’ ” She noted Greene had contacted Attorney Fisher for trust certifications, so he could finalize the seller vesting issues.
At 4:34 p.m., Jennings e-mailed a revised closing estimate to Ash. She sent a trust certification for him to complete, but acknowledged later that she already had the trust certification he signed for US Bank.
Ash forwarded the closing estimate to Blankenship. At 4:48 p.m., Blankenship requested that Ash send a signed copy of the closing estimate and asked Jennings for wiring instructions. Ash faxed Blankenship a signed copy of the closing estimate. Jennings did not reply.
On Friday, November 21, 2008, the day escrow was scheduled to close, Jennings had all the funds necessary from Ash to close the transaction except the wire transfer from LandAmerica. Blankenship sent another e-mail to Jennings asking, “When do you need the funds wired?” Jennings did not respond. Ash tried to call Jennings several times but was not able to reach her. He believed the wire transfer from LandAmerica had been completed.
At 1:16 p.m. on November 21, 2008, Jennings sent documents for the third party to sign. She notified Lemer that escrow could close if they got copies of the documents back by e-mail or fax. Lemer asked NAT to record the third party deeds of trust as an accommodation, releasing NAT from claims arising from the recording.
At 4:24 p.m. on November 21, 2008, Richard e-mailed some of the remaining vesting documents to Jennings. He could not find a copy of the exemption trust. He wrote, “I will look over the weekend at my home storage unit for a copy. Please [ask] your title person if the waiver is sufficient especially in light of the recorded deeds.” The third party e-mailed executed documents to Jennings at 4:55 p.m., but without the complete vesting documents, escrow could not close.
On Monday, November 24, 2008, LandAmerica notified its clients that it was filing for bankruptcy. The bankruptcy court froze all of the assets that *1285 LandAmerica controlled. Jennings wrote an e-mail to Blankenship and Ash asking, “Sarah or David, can you confirm how much you will be wiring and when you will wire?” NAT recorded the third party deeds of trust that day.
Lemer’s vesting issues were later resolved, and the parties eventually executed agreements to extend escrow. Ash would not have signed the extension agreements, however, if he had known of Lemer and NAT’s actions that prevented escrow from closing. Ash did not cancel the transaction, because he would have lost his deposits and been unable to complete the tax-deferred exchange. He paid interest on the US Bank loan. After five months, US Bank required Ash to repay the loan, because no deed of trust had been recorded to secure it. Ash was not receiving income from the property and had to borrow money from his mother. He hired an attorney to represent his interests in the bankruptcy and try to get his money released in order to complete the transaction. The bankruptcy court eventually released Ash’s funds in January 2010. With the funds and a new loan at a higher interest rate from Wells Fargo, escrow closed in March 2010. However, the tax-deferred exchange was not completed within the time allowed and Ash had to pay significant taxes on his gain from the sale of the Wilshire property.
Ash sustained direct damages totaling $1,033,000 as a result of the failure to meet the escrow deadline, including his tax exposure, the interest that he paid on the US Bank loan, the increased interest rate on the Wells Fargo loan, and his attorney fees to obtain his funds from the bankrupt estate.
II. Legal Proceedings
On April 13, 2009, Ash filed a complaint against Lemer for breach of the purchase agreement and against NAT for breach of the escrow instmctions and breach of fiduciary duty. On March 2, 2010, Ash filed an amended complaint, adding a cause of action against NAT for negligence.
A jury trial began on July 20, 2011. Ash’s escrow expert Vickie Crestani explained that although LandAmerica’s bankruptcy was unusual, it was not the first time in her history of working with qualified intermediaries that an intermediary had declared bankruptcy. Crestani was disturbed to hear that LandAmerica had closed its doors, but could not say that she was surprised. There had been mmors among LandAmerica employees that LandAmerica would fold up and close its doors. Crestani could not say whether these mmors were generally known by people in the real estate industry in Southern California.
Crestani testified that Jennings had a fiduciary duty to follow Ash’s instmctions to obtain his funds. Jennings failed to secure the funds from *1286 Ash’s qualified intermediary when he requested them, which she should have done even if escrow was going to be delayed by a day or two.
In addition, the escrow instructions did not allow Lemer to encumber the property before escrow closed. When Jennings received information that constituted a material change to the escrow, she needed to immediately advise Ash of the seller’s intentions to encumber the property and give Ash the opportunity to work out his options. NAT and Jennings accommodated Lerner and assisted in the delay of escrow closing, rather than closing the transaction.
Ash had completed everything that he needed to do to close the transaction. According to Crestani, when Jennings accepted loan proceeds from US Bank, she should have communicated with Ash that she would not be able to record the transaction and did not have his funds from LandAmerica. She should have gone over his options, including returning the loan proceeds, obtaining the funds from LandAmerica, or investing Ash’s funds in commercial paper or an interest-bearing account.
Ash’s accountant testified that when the section 1031 exchange failed, Ash’s tax liability included $465,000 attributable to the Venice property transaction. Ash’s damages expert Winston Elton testified that as a result of the failure to close escrow on time, Ash suffered the following damages: $166,000 of lost income from the property which Lemer collected instead; the additional tax liability of $465,000; legal costs of $140,000; payments and fees on the US Bank loan totaling $42,000; interest of $28,000 on a loan from his mother; and an additional $189,000 for the new loan from Wells Fargo. Therefore, the total amount of Ash’s direct damages was about $1,033,000.
During closing arguments, Ash argued that LandAmerica’s bankruptcy was the elephant in the room, but Lemer and NAT invited the elephant in by shirking their obligations to meet the escrow deadline. Lemer had breached the purchase agreement by recording deeds of trust that changed the title and failing to deliver title by the escrow deadline. NAT breached its agreement with Ash by failing to request Ash’s funds from LandAmerica and breached fiduciary duties by failing to act on Ash’s behalf. Specifically, NAT failed to follow Ash’s instructions to get his funds from LandAmerica, concealed information about the delay and entered into a side agreement with Lemer to record third party deeds of trust. NAT was negligent because Jennings failed to properly determine the property owners at the outset of escrow, did not timely send out documents, ignored the escrow deadline, and did not disclose conflicts to Ash. Ash sought four categories of damages totaling approximately $1 million: the taxes incurred, lost profits, legal costs from the bankruptcy, and his costs related to the loans.
*1287 In Lemer’s closing argument, Lemer argued that a section 1031 exchange is not tax forgiveness, but simply tax deferral, so it was pure speculation as to what Ash’s tax liability would have ultimately been. In addition, Ash was seeking duplicative damages by asking for lost income as well as the payments made on the loans to acquire the property. Lemer noted that everyone was shocked when LandAmerica went into bankruptcy, and ultimately, it was LandAmerica that took Ash’s money.
NAT also argued that LandAmerica’s bankruptcy was an unforeseeable and extraordinary event. No one had expected or foreseen that it was going to happen. Escrow did not close on Monday, November 24, 2008, or later, because LandAmerica closed its doors, which was not caused by NAT or Lemer. Ash could not blame NAT that the bankruptcy judge refused to disburse funds held by LandAmerica.
On August 2, 2011, the jury returned its verdict. The jury found NAT breached its contract with Ash. All the conditions occurred that were required for NAT’s performance. NAT failed to act as required under the contract and Ash was harmed. The total damages attributable to NAT for breach of contract were $250,000. NAT also breached a fiduciary duty owed to Ash, which caused damages of $250,000. In addition, the jury found that NAT was negligent, which was a substantial factor in causing harm to Ash, and attributed damages of $500,000 to NAT for negligence. Moreover, the jury found that NAT acted with malice, oppression, or fraud, and a managing agent of NAT authorized the conduct. Therefore, the jury also awarded punitive damages of $750,000 against NAT.
As against Lemer, the jury found that Lemer entered into a contract to sell commercial real property to Ash, and Ash had substantially performed under the agreement. Lemer failed to act as the contract required and Ash was harmed as a result. The jury attributed $300,000 of Ash’s damages to Lemer’s breach of the purchase agreement.
On September 19, 2011, the trial court entered judgment against NAT in the amount of $1.75 million and against Lemer in the amount of $300,000. Lemer and NAT filed motions for new trial and judgment notwithstanding the verdict, while Ash filed a motion seeking attorney and expert fees from Lemer and NAT. The court granted NAT’s motion for judgment notwithstanding the verdict as to the claim for punitive damages and otherwise denied the motions. On November 8, 2011, the court entered an amended judgment.
*1288 DISCUSSION

Standard of Review

“ ‘When findings of fact are challenged on appeal, we are bound by the familiar and highly deferential substantial evidence standard of review. This standard calls for review of the entire record to determine whether there is any substantial evidence, contradicted or not contradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor.’ (People ex rel. Brown v. Tri-Union Seafoods, LLC (2009) 171 Cal.App.4th 1549, 1567 [90 Cal.Rptr.3d 644].)” (Hub City Solid Waste Services, Inc. v. City of Compton, supra, 186 Cal.App.4th at pp. 1128-1129.)

Foreseeability of Contract Damages

The majority accepts the contention of Lemer and NAT that Ash’s damages were unforeseeable as a matter of law and there is no substantial evidence to support the jury’s finding that the damages were foreseeable. I disagree.
“Damages awarded to an injured party for breach of contract ‘seek to approximate the agreed-upon performance.’ [Citation.] The goal is to put the plaintiff ‘in as good a position as he or she would have occupied’ if the defendant had not breached the contract. [Citation.] In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff’s contractual bargain. [Citations.]” (Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist. (2004) 34 Cal.4th 960, 967-968 [22 Cal.Rptr.3d 340, 102 P.3d 257] (Lewis).)
There are two types of contractual damages: “general damages (sometimes called direct damages) and special damages (sometimes called consequential damages).” (Lewis, supra, 34 Cal.4th at p. 968.) General damages are “those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach. (Civ. Code, § 3300 [damages ‘which, in the ordinary course of things, would be likely to result’ from breach]; Mitchell v. Clarke (1886) 71 Cal. 163, 167-168 [11 P. 882] [general damages are those that naturally and necessarily result from breach].) Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are ‘deemed’ to have contemplated them. (Calamari & Perillo, The Law of Contracts (2d ed. 1977) § 14-5, p. 525; Hunt Bros. Co. v. San Lorenzo Water Co. (1906) 150 Cal. 51, 56 [87 P. 1093] [parties need not ‘actually have contemplated the very consequence that occurred,’ but they would have supposed such a consequence was likely to follow a breach].)” (Lewis, supra, 34 Cal.4th at p. 968.)
*1289 Special damages “are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test). [Citations.] Special damages ‘will not be presumed from the mere breach’ but represent loss that ‘occurred by reason of injuries following from’ the breach. [Citation.] Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract. [Citation.]” (Lewis, supra, 34 Cal.4th at pp. 968-969.)
“Contract damages, unlike damages in tort (Civ. Code, § 3333), do not permit recovery for unanticipated injury. [Citation.] Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach [citations]. Alternatively, the nature of the contract or the circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be ‘the probable result’ of the defendant’s breach. [Citation.] Not recoverable as special damages are those ‘beyond the expectations of the parties.’ [Citation.] Special damages for breach of contract are limited to losses that were either actually foreseen (see, e.g., Dallman Co. v. Southern Heater Co. (1968) 262 Cal.App.2d 582, 586 [68 Cal.Rptr. 873] [in contract negotiations, supplier was put on notice that its failure to perform would result in lost profits]) or were ‘reasonably foreseeable’ when the contract was formed. [Citation.]” (Lewis, supra, 34 Cal.4th at pp. 969-970.)
Ash testified that just before the parties entered their transaction, the most well-known intermediary closed its doors due to Washington Mutual’s bankruptcy. Ash developed concerns about the financial viability of LandAmerica, and he told Jennings that he was anxious to have his money safely reinvested in the property. In other words, Ash communicated his fear to NAT that his funds were not safe with the intermediary. The extent of Ash’s concern was underscored by the fact that he had LandAmerica transfer a significant portion of his funds into escrow early.
The jury understood Ash’s testimony about the collapse of the banking system and the state of the industry in reference to the economic crisis of 2008, the worst financial crisis in the United States since the Great Depression. (Cheffins, Did Corporate Governance “Fail” During the 2008 Stock *1290 Market Meltdown? The Case of the S&P 500 (2009) 65 Bus. Law. 1, 1-2.) Venerable investment bank Bear Stems was an early casualty of the financial crisis in March 2008. (The Financial Crisis Inquiry Report, Pub.L. No. 111-21 (Jan. 2011) pp. 289-291, available at <http://fcic.law. stanford.edu/report> [as of Feb. 18, 2014] (Financial Crisis Report).) From there, financial market conditions deteriorated rapidly in the late summer and early fall of 2008. (West v. JPMorgan Chase Bank, N.A. (2013) 214 Cal.App.4th 780, 786 [154 Cal.Rptr.3d 285].)
On September 7, 2008, the federal government placed two iconic mortgage institutions, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), into conservator-ship. (Financial Crisis Report, Pub.L. No. 111-21, supra, at p. 309.) Investment bank Lehman Brothers declared bankruptcy on September 15, 2008, and American International Group, Inc. (AIG), failed as well. (Id. at p. 353.) Investors began pulling deposits out of strong banks far removed from the businesses at the center of the crisis. (Id. at pp. 353-354.) In a span of eight days, depositors withdrew $16.7 billion from Washington Mutual. (Id. at p. 365.) On September 25, 2008, the Office of Thrift Supervision (OTS) issued an order closing Washington Mutual and appointing the Federal Deposit Insurance Corporation (FDIC) as receiver. (Jolley v. Chase Home Finance, LLC (2013) 213 Cal.App.4th 872, 879 [153 Cal.Rptr.3d 546], citing U.S. Dept. of the Treasury, Off. of Thrift Supervision Order No. 2008-36 (Sept. 25, 2008); 12 U.S.C. § 1821(c).) Washington Mutual’s collapse was the largest bank failure in United States history. (Amer et al., Central Banks and Central Bank Cooperation in the Global Financial System (2010) 23 Pac. McGeorge Global Bus. & Dev. L.J. 1, 23.)
On October 8, 2008, in the midst of the economic crisis, Ash and Lemer entered into their purchase agreement. The Financial Crisis Report described the economic climate at that time: “as massive losses spread throughout the financial system in the fall of 2008, many institutions failed, or would have failed but for government bailouts. As panic gripped the market, credit markets seized up, trading ground to a halt, and the stock market plunged.” (Financial Crisis Report, Pub.L. No. 111-21, supra, at p. 386.)
The jury was entitled to interpret the evidence in light of common human experience and matters of common knowledge. (Gottloeb v. Melrose Health Baths (1957) 148 Cal.App.2d 313, 317 [306 P.2d 568].) The economic crisis of 2008 had a significant impact on American lives. (Gadinis, From Independence to Politics in Financial Regulation (2013) 101 Cal. L.Rev. 327, *1291 350.) “Dramatic government initiatives and violent market reactions kept the crisis in daily headlines. The eleventh-hour bailouts of Bear Steams, Merrill Lynch, and AIG, and Lehman’s spectacular collapse, increased the salience of the issue and the visibility of the main actors. In a 2008 poll on the then-evolving financial crisis, an impressive 84 percent of respondents stated that they pay at least some attention to reports about failing financial institutions such as Lehman, AIG, and Washington Mutual, with 57 percent stating that they pay a lot of attention.” (Id. at pp. 350-351, fn. omitted.) “Although the national and state economies already were in dire straits [in September 2008], shortly thereafter the economy further deteriorated dramatically in light of the financial credit crisis and the resulting stock market collapse in October 2008 and a sharp decline in real estate values and consumer spending.” (Professional Engineers in California Government v. Schwarzenegger (2010) 50 Cal.4th 989, 1001 [116 Cal.Rptr.3d 480, 239 P.3d 1186].)
The economic crisis that gripped the United States in 2008 and the risk of bankruptcy were not particular to LandAmerica. The conditions created a foreseeable risk in any similar agreement at that time. Ash’s damages from the delay in closing escrow were general damages, not special damages. It was sufficiently predictable at the time that the parties entered into their agreement that if NAT failed to obtain Ash’s funds and left them with the intermediary, NAT gambled on whether LandAmerica would be the next financial institution to fail. Larger, established institutions collapsed before the parties even entered their agreement. Richard was as sophisticated an investor as Ash, if not more so. If escrow failed to close on time, it was certainly predictable to Lemer that Ash would lose income from the property and might have to arrange a new loan on less favorable terms. Whether the bankruptcy and damages resulting from delay were foreseeable to the parties at the time of contracting were factual issues for the jury to determine. The jury heard the evidence and found the damages were foreseeable, and I would conclude from the above that the jury’s findings were supported by substantial evidence.
I agree with the majority that a superseding cause instruction was warranted in connection with the tort causes of action against NAT. However, NAT fully argued that LandAmerica’s bankruptcy was an unforeseeable event and the cause of Ash’s damages. The breach of contract instructions required the jury to find that either the harm was likely to arise in the ordinary course of events from the breach, or both parties could reasonably have foreseen the harm as a probable result of the breach when the contract was made. The jury not only awarded contract damages against NAT, but they awarded the entire amount of Ash’s damages and found punitive damages were warranted as *1292 well. Based on the arguments and the jury’s findings, I do not believe it is reasonably probable that the jury would have reached a different result had they been given a superseding cause instruction as to a few of the claims.
A petition for a rehearing was denied March 5, 2014. Kriegler, J., was of the opinion that the petition should be granted.

 Because more than one party or participant shares the last name Lemer, they are referred to individually by their first names.