Filed 1/20/16  P. v. Superior Court (Sahlolbei) CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Petitioner, | E062380 |
| v. | (Super.Ct.No. INF1302523) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | O P I N I O N |
| Respondent; | |
| HOSSAIN SAHLOLBEI, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of prohibition/mandate.  Michael J. Naughton, Judge.  (Retired Judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Petition is denied

Paul E. Zellerbach, Michael A. Hestrin, District Attorneys, and Emily R. Hanks, Deputy District Attorney, for Petitioner.

1

No appearance for Respondent.

Brown White & Newhouse, Brown White & Osborn and Kenneth P. White, for Real Party in Interest.

As relevant to this petition, defendant and real party in interest Hossain Sahlolbei (Dr. Sahlolbei) was charged with violating Government Code section 1090,[1] which generally prohibits acts constituting a conflict of interest on the part of "[m]embers of the Legislature, state, county, district, judicial district, and city officers or employees . . . ."[2] The trial court followed binding appellate precedent and dismissed the charge. The People seek review, and we affirm the trial court finding, that defendant is not subject to that statute.

## I. STATEMENT OF FACTS

The operative facts relating to the alleged offense are not in dispute for the purposes of this petition. Palo Verde Hospital (PVH) is a "district hospital" which qualifies as a public entity. At all relevant times, Dr. Sahlolbei served as codirector of surgical services with PVH pursuant to a contract which specifically described him as an

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] Subdivision (a) of section 1090 reads, in full: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity." The criminal penalty is set out in section 1097.

independent contractor. He also served on the Medical Executive Committee (MEC) either as chief of staff or vice chief of staff and had considerable influence over the hospital board and its decisions with respect to hiring and issuing credentials to physicians.

On two occasions Dr. Sahlolbei solicited an outside physician to provide contract services to PVH.[3] On each occasion Dr. Sahlolbei agreed that the physician would be paid X dollars per month for his services, and then negotiated an agreement with PVH's board of directors to pay the physician X plus several thousand dollars per month. Dr. Sahlolbei retained the difference. These general allegations form the basis for the charge under section 1090.

The dispute is whether Dr. Sahlolbei can be held criminally liable under Government Code section 1090, which expressly governs the actions of "officers or employees" of the district. The trial court granted Dr. Sahlolbei's motion to dismiss the charge pursuant to Penal Code section 995, and the People sought review by way of a petition for writ of prohibition/mandate. We issued an order to show cause and now deny the petition.

---

[3] With respect to one of these physicians, Dr. Ahmad, the trial court granted Dr. Sahlolbei's motion to dismiss based on the statute of limitations. Thus, count 4, although based on the same legal theory as count 1, is not involved in this petition. Rather than detail the facts presented with respect to the two transactions, we provide merely a general description.

## II. DISCUSSION

A. *Standard of Review*

"'In determining if charges in an information can withstand a motion under [Penal Code] section 995, neither the superior court nor the appellate court may reweigh the evidence or determine the credibility of the witnesses. [Citations.] Ordinarily, if there is some evidence in support of the information, the reviewing court will not inquire into its sufficiency. [Citations.] Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.] [¶] "[A]lthough there must be *some* showing as to the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate." [Citation.] "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." [Citations.] Thus, the ultimate test is that ""'[a]n information will not be set aside or prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.*""" [Citation.] [¶] We review the evidence in support of the information to determine whether as a matter of law it is sufficient, not whether the trial court's ruling was reasonable. [Citations.]' [Citation.]" (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 842.)

B. *Analysis*

To resolve the present matter we need look no farther than the plain language of section 1090, the case of *People v. Christiansen* (2013) 216 Cal.App.4th 1181, and the common law indicia of employment.

In its relevant portion, section 1090 provides: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." By its terms, the statute deals with officers or employees, not independent contractors. "'[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . .' [¶] . . . 'In the construction of a statute . . . , the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . .' [Citations.] [¶] . . . ""[A] court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language."" [Citation.] '[C]ourts are not at liberty to impute a particular intention to the Legislature when nothing in the language of the statute implies such an intention. . . .' [Citation.]" (*Vikco Ins. Services,*

*Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 61-62.)  By its terms, the statute applies to "employees"; it does not apply to conduct of independent contractors.

Further, and within the context of due process, a statute imposing criminal liability must be sufficiently definite and describe with reasonable certainty those to whom the statute applies and the conduct that it proscribes.  (*People v. Honig* (1996) 48 Cal.App.4th 289, 339; *People v. Vincelli* (2005) 132 Cal.App.4th 646, 650.)  By its express provisions, there is no indication that section 1090 applies to independent contractors.

In *People v. Christiansen*, *supra*, 216 Cal.App.4th 1181, the appellate court reversed the defendant's convictions of four counts of violating section 1090 on the basis that, as an independent contractor, she was not subject to the proscriptions of the statute. The court found that the term "employee" did not include an individual working as an independent contractor.  (*People v. Christiansen*, *supra*, at p. 1183.)

There, between 2004 and June of 2006, the defendant had been employed by a school district as its "Director of Planning and Facilities."  In 2006, she ceased being employed by the school district and became a consultant.  It was during her tenure as a consultant that she financially benefited from contracts entered into between the district and companies in which she was involved.  The court, in reaching its conclusion that Christiansen was not an employee for purposes of section 1090, compared indicia of her relationship with the school district as it existed between 2004 and 2006 against the period of time she served as a consultant.  In so doing, it pointed out that section 1090

6

does not contain a definition of "employee" and that in *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1086-1087 the Supreme Court stated that unless the language of a statute clearly indicates otherwise, it should be construed in light of the common law. Specifically, the court in *Reynolds* commented that in the case of "'a statute referring to employees without defining the term—courts have generally applied the common law test of employment.'"[4] (*Id.* at p. 1087, cited in *People v. Christiansen*, *supra*, 216 Cal.App.4th at pp. 1188-1189.)  The *Christiansen* court then concluded that, "[b]ecause it is undisputed that at all relevant times Christiansen was an independent contractor, she was not an employee within the meaning of section 1090 . . . ." (*People v. Christiansen*, *supra*, at p. 1189.)  The court acknowledged that while the defendant's job duties, in essence, remained the same, the consulting contract entered into with the district identified her as an independent contractor, not an employee.  Further, as an employee, she had received employee benefits, such as medical and dental coverage along with vacation and sick leave; as an independent contractor, she was required to provide worker's compensation insurance as well as general liability insurance.  Lastly, the court noted that neither as an employee nor a consultant was she allowed to enter into contracts on behalf of the school district.

---

[4] In *Reynolds,* employees alleging wage and hour violations under the Labor Code sought to hold officers of their corporate employer directly liable.  It was in this context that the court, applying the common law definition of "employee," rejected the plaintiff's claims. (*Reynolds v. Bement*, *supra*, 36 Cal.4th at pp. 1087-1088.)

While not specifically discussed in *Christiansen,* further common law indicia of employment can be found in *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522. "While the extent of the hirer's right to control the work is the foremost consideration in assessing whether a common law employer-employee relationship exists, our precedents also recognize a range of secondary indicia drawn from the Second and Third Restatements of Agency that may in a given case evince an employment relationship. Courts may consider '(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.' [Citations.]" (*Id.* at p. 532.)

With all of these criteria in mind, we now look to the facts placed before the court at the preliminary hearing upon which the Penal Code section 995 motion was granted. Evidence of the relationship between Dr. Sahlolbei and the hospital district was provided through the testimony of individuals directly associated with the hospital district and its board, and by various written agreements entered into between Dr. Sahlolbei and the district.

Dr. Sahlolbei was a medical doctor independent of the hospital. He was associated with the district in three ways: (1) as a member of the MEC in which at times he was chief of staff; (2) by having an on-call agreement with the hospital; and, (3) as codirector of the surgery department.

As testified to, the medical staff of the hospital was a self-governing body. The MEC was the governing board of the medical staff. Members of the MEC were selected by a vote of the doctors. The chief of staff was elected by the doctors. A chief of staff's primary duties were to make sure the by-laws were followed and to act as a go-between with the medical staff and the board. At times, Dr. Sahlolbei was chief of staff.

The MEC made recommendations to the board of the hospital district regarding the hiring of doctors and on issues of quality assurance. The board relied heavily on the MEC to assess and review a prospective physician's application. As chief of staff, Dr. Sahlolbei would appear before the board to present the recommendations of the MEC as to the hiring of doctors. The board had the final say as to which doctors were hired.

Dr. Sahlolbei did not have the authority to provide anesthesia services for the hospital nor did he have the authority to contract with others or hire an anesthesiologist without board approval.

Over 99 percent of the doctors under contract with the hospital were independent contractors. Dr. Sahlolbei was an independent contractor. As codirector of the surgery department, he acted as a consultant to the board. As codirector of the surgery department, he had a contract which provided that he was acting as an independent

9

contractor. He was paid a stipend as director of the surgery department. The hospital and Dr. Sahlolbei also had an on-call agreement that required physicians to be available or have another physician available 24 hours a day seven days a week. Under the on-call service agreement, Dr. Sahlolbei was an independent contractor.[5]

Of particular note is the "Surgical Services Co-Director Agreement." In its relevant portions, the contract provided:

"2. <u>Co-Director Surgical Services</u>. Co-Director's duties as Co-Director shall include:

"1. Directs the formation and content of monthly meetings of the Surgical Services Committee,

"2. Assist Hospital in maintaining compliance with CMS Conditions of Participation, Title 22, JCAHO standards, and other customary regulations.

"3. Devote necessary time to provide consultation to other practitioners of the medical staff.

"4. Provides professional guidance and support to the Surgical Services staff.

"5. Supervises the development and implementation of the Departmental policy and procedures.

"6. Assesses compliance with established Surgical Services policies and procedures, including standards of practice, and current evidence based research studies and/or strong theoretical rationales."

---

[5] Our record does not contain a copy of the on-call agreement.

"As the Co-Director of the Facility, Hospital shall pay Co-Director $3000.00 per month as a CoDirectorship fee as consideration for this agreement and for the performance and documentation of the services listed in Section 2 above. Co-Director shall devote a minimum of 15 hours per month to providing said services and shall document the time, nature and date of the services on a form to be provided by Hospital and provide the same to the CEO no later than the 5th day of the month following the month when the services were provided."

The contract provided that defendant was to supervise the work of hospital employees and assist in the training of employees. The agreement further allowed for either party to terminate the agreement without cause upon 60 days' written notice. Pursuant to its terms, Dr. Sahlolbei, at his sole expense, was to maintain professional liability insurance of $1 million/$3 million.

As to Dr. Sahlolbei's status, the following was provided: "Co-Director shall act at all times under this Agreement as an independent contractor. The parties agree that Hospital shall not have and shall not exercise any control or direction over the manner or method by which Co-Director provides the services hereunder. Hospital shall not withhold from amounts paid to Physician, state or federal income tax withholding, FICA, FUTA, workers compensation, state unemployment or other amounts. Physician agrees to indemnify, hold harmless and defend Hospital from and against any amount that it pays as a result of not withholding said amounts in the event that demand is made on

Hospital to pay the same or in the event that Hospital determines that it is legally obligated to pay said amounts."

Further, the contract had an indemnification clause in which Dr. Sahlolbei agreed to indemnify the hospital for liability on account of his negligence. Lastly, the contract provided: "In no event shall this Agreement be construed in any way to prohibit, limit or restrain Hospital from entering into a contract or agreement, at any time, with any other Physician for the provision of medical services at Facility."

As evident from the above facts, there was clearly no evidence that Dr. Sahlolbei was an employee of the hospital district from the standpoint of being paid a salary or an hourly wage. Further, there was no evidence that the district paid for any benefits or provided Dr. Sahlolbei with vacation or sick leave. There was no evidence that the hospital district controlled the activities of Dr. Sahlolbei; in fact, from the provisions of the contract entered into between the district and Dr. Sahlolbei, the district disclaimed any right to control. While certainly there were things Dr. Sahlolbei needed to do as codirector of surgery, the duties outlined in the agreement were relatively nondescript and did not include the right to hire hospital staff. Clearly, he was a specialist, and by the nature of his profession he worked without supervision. The contract was of limited duration, one year, and the district did not directly control how Dr. Sahlolbei allotted the 15 hours expended as the codirector of surgery. Further, both the testimony and the written agreement support the notion that Dr. Sahlolbei was an independent contractor, not an employee. While Dr. Sahlolbei, as chief of staff and as a member of MEC, did

12

appear before the board and consult as to the hiring of doctors and presumably on issues of quality control, there was no evidence that he did so as anything other than as a representative of the doctors practicing at the hospital.[6]

As such, we believe there to be a total absence of evidence that Dr. Sahlolbei, during the time at issue, was acting as an "employee" of the district. As such, the trial court properly granted his Penal Code section 995 motion as to count 1 of the information.

To support its argument that section 1090 is applicable to "independent contractors," the People rely primarily on the civil cases of *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114 (*Hub City*) and *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc. (*2007) 148 Cal.App.4th 682. Initially, as stated in *Christiansen*: "We express no opinion on the soundness of those opinions in the *civil* context, but we hold that their expansion of the statutory term 'employees' to apply to independent contractors does not apply to *criminal* prosecutions for violation of section 1090. At least for purposes of criminal liability under section1090, an independent contractor is not an employee." (*People v. Christiansen*, *supra*, 216 Cal.App.4th at p. 1189; accord, *People v. Lofchie* (2014) 229 Cal.App.4th 240, 252; see also *Davis v. Fresno Unified School Dist.* (2015) 237

---

**6** The record demonstrates that as to Dr. Barth, Dr. Sahlolbei appeared before the board as a representative of Dr. Barth.

13

Cal.App.4th 261, 300 ["The stricter definition of the statutory terms adopted by the court in [*Christiansen*] is appropriate in the context of criminal prosecution . . . .].)[7]

*Christiansen*'s holding aside, and even assuming that section 1090 covers conduct by independent contractors, there is still a total absence of evidence that Dr. Sahlolbei was acting in an official capacity or performing an authorized public function, as were defendants in *Hubb City* and *California Housing Finance Agency*.

In *Hub City*, the City of Compton was awarded $22 million against defendant Aloyan. Aloyan had been an independent contractor with the city, in charge of its waste management. During his relationship with the city he negotiated a contract with the city to privately provide waste management services. Shortly after city council approval he made campaign contributions to the city council members that voted to approve the contract. He additionally hired relatives of one of the council members. Of import to the court's decision that section 1090 applied to Aloyan's conduct was the fact that at the time of the conduct he was performing a public function authorized by the city. As stated: "In May 2000, Compton entered into a management agreement with Aloyan's company, AUS. Under the management agreement AUS was an independent contractor but assumed many of the city's waste management needs; [the city manager] described AUS as 'providing the private management' of the city's in-house waste operation. . . . Under the agreement Aloyan acted as the director of the in-house waste division, working

---

[7] The People also rely on *People v. Gnass* (2002) 101 Cal.App.4th 1271, which will be discussed, *post*.

14

alongside city employees, overseeing day-to-day operations of Compton's waste management division, and taking responsibility for public education and compliance with state-mandated recycling and waste reduction efforts." (*Hub City*, *supra*, 186 Cal.App.4th at pp. 1119-1120, fn. omitted.)

"The evidence presented at trial was sufficient to establish that Aloyan fell within the ambit of section 1090. Pursuant to the management agreement between AUS and Compton, Aloyan supervised city staff, negotiated contracts, and purchased equipment and real estate on behalf of the city. His activities served a public function and he was intricately involved in the city's waste management decisions." (*Hub City*, *supra*, 186 Cal.App.4th at p. 1125.)

In finding section 1090 applicable, the *Hub City* court focused on facts demonstrating that at all times Aloyan was performing a public function (in charge of the city's in-house waste management) with the City of Compton; as such, he was acting within an official capacity with the city. Such is not the case here. Here, there was no evidence that at any time was it part of Dr. Sahlolbei's duties, either as a member of the MEC or as codirector of surgery, to find doctors to serve on the hospital's staff or negotiate their salaries on behalf of the board. There is nothing in our record to indicate that Dr. Sahlolbei had a relationship with the district in which he performed public functions on behalf of the district such that he could be deemed to be acting within his official capacity.

15

The same is true with *California Housing Finance Agency*. There, Attorney McWhirk was general counsel for California Housing Finance Agency (CHFA) from 1984 to 1990. CHFA was a direct lender, loan purchaser, and mortgage insurer. In 1991, McWhirk became outside counsel pursuant to a written agreement. While serving as outside counsel he formed a company with a straw person acting as president. He thereafter influenced CHFA as its attorney to enter into a contract with his company for his company to administer loan payments being made to CHFA. During the life of the contract, administration fees grew. Eventually an audit showed that McWhirk's company had overcharged CHFA for those fees. McWhirk was sued on a number of theories, including one based on section 1090. The court affirmed the applicability of section 1090 to its facts. Its facts, however, are different than ours. There, McWhirk was the attorney for the governmental agency, who looked to him for advice. He was under contract to advise the board of CHFA. Whether hired as a staff attorney or as independent counsel, he had an ongoing relationship with CHFA in which he was performing a public function in an official capacity. Here, Dr. Sahlolbei was not hired or paid by the district to advise them on who they should hire or how much the district should pay. While as chief of staff, the board may have listened to and accepted his recommendations, he was nonetheless acting independent of the board. In appearing before the board as it relates to Dr. Barth's salary, the record is clear that he was appearing on behalf of Dr. Barth, not as a representative of the district performing a public function. There is simply nothing in our record to indicate that the district viewed

16

Dr. Sahlolbei as performing a public function, or at any time treated Dr. Sahlolbei as acting in an official capacity.

Equally distinguishable is *Gnass.* There, as in *California Housing Finance Agency*, the defendant was an attorney who was an independent contractor hired by the City of Waterford to advise on various bond issues; he also served as the attorney for the authority issuing the bonds; as such, he had a conflict of interest. The court found that as the attorney for the city, he was performing a public function although he was technically an independent contractor. As such, he was acting in an official capacity.

The facts of the cases relied upon by the People simply do not exist here. There is nothing to suggest that Dr. Sahlolbei was ever in a role or had an ongoing relationship with the district such that he performed public functions on behalf of the district. While Dr. Barth may have thought Dr. Sahlolbei had the authority to negotiate a contract, such perception was based solely on Dr. Sahlolbei's representations. There is nothing in the record to suggest that he was exercising any ostensible authority granted to him by the hospital district.

While certainly we do not say there is no criminal conduct, we do say that it does not fall within the parameters of section 1090.

### III.  DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

17

J.

I concur:


MILLER
                                J.

[*People v. Superior Court (Sahlolbei)*—E062380

**HOLLENHORST, J.**, Dissenting.

I agree with the majority that defendant Hossain Sahlolbei's behavior, as alleged, constitutes criminal conduct. I further agree that some existing case law, particularly *People v. Christiansen* (2013) 216 Cal.App.4th 1181 (*Christiansen*), supports the conclusion that the alleged conduct does not fall within the parameters of Government Code[1] section 1090, at least for purposes of criminal liability.

In my view, however, *Christiansen* is incorrect to establish an absolute rule that an independent contractor for a public entity—as distinguished from an employee, as the two terms are defined under the common law of torts—may never be subject to criminal liability for violating section 1090. I would therefore decline to follow *Christiansen*, and would find defendant's motion to dismiss the section 1090 charge should not have been granted.

The question of whether defendant's behavior falls within the scope of section 1090 is "ultimately one of legislative intent, as '[o]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.'" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 50 (*Martinez*).) We start our analysis with the statutory language, but where statutory language "'allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may

_____

[1] Further undesignated statutory references are to the Government Code.

1

also consider the consequences of a particular interpretation, including its impact on public policy.'" (*Id.* at p. 51.)

The statutory language of section 1090 allows for more than one reasonable construction. A number of courts have construed the term "employee," as used in section 1090, to encompass at least some individuals providing services as independent contractors. (E.g., *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 693 (*California Housing*) ["an attorney whose official capacity carries the potential to exert 'considerable' influence over the contracting decisions of a public agency is an 'employee' under section 1090, regardless of whether he or she would be considered an independent contractor under common law tort principles"]; *Hub City Solid Waste Service, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1125 (*Hub City*) ["An individual's status as an official under [section 1090] turns on the extent to which the person influences an agency's contracting decisions or otherwise acts in a capacity that demands the public trust."].) In contrast, the *Christiansen* court construed the same statutory language to encompass only those individuals who would be classified as an employee under the common law test of employment, at least for the purpose of determining criminal liability for willful violation of section 1090. (*Christiansen*, *supra*, 216 Cal.App.4th at pp. 1189-1190.) The People have conceded that defendant "qualifies as an independent contractor under common law tort." The plain language of section 1090 alone, therefore, does not answer the question presented by the case at bar.

The fundamental purpose of section 1090 is to act prophylactically against the temptation of self-dealing, which might compromise the judgment of a public official or employee or cast doubt on his or her loyalty and allegiance, and to avoid the appearance of impropriety. (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1330 (*Carson*).) *Christiansen* holds that someone who provides services as an independent contractor, under the definition of the term developed in the common law of torts, may not be held criminally liable for violating section 1090. (*Christiansen*, *supra*, 216 Cal.App.4th at pp. 1189-1190.) This holding effectively carves out a safe harbor for independent contractors to engage in self-dealing, which is inconsistent with accomplishing section 1090's prophylactic purposes. (See *Carson*, *supra*, at p. 1335 [a "prophylactic statute such as section 1090 should be construed broadly to close loopholes; it should not be constricted and enfeebled."].)

Perhaps many, or even most, independent contractors are not in a position to benefit from improper self-dealings. Nevertheless, the realities of modern-day government economics make outsourcing of even core government functions commonplace, as public entities attempt to trim costs. (See, e.g., *Service Employees Internat. Union, Local 1021, AFL-CIO v. County of Sonoma* (2014) 227 Cal.App.4th 1168, 1171; *Costa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 302.) The facts of *Christiansen* are a prime example. The defendant in that case was a former employee of a school district, who continued to provide the same services to the district under a new contract, but now as an independently contracted "consultant." (*Christiansen*, *supra*, 216 Cal.App.4th at p. 1184.) These duties included

3

"identifying companies to perform work for the District." (*Id.* at p. 1186.) The prosecution alleged that the defendant was financially interested in four contracts entered into by the district on the defendant's recommendation. (*Id.* at pp. 1186-1187.) Three of the contracts were between the district and a company that had also hired defendant's company—an LLC, of which she was the sole member and owner—as a consultant, while the fourth was based on an amendment to a contract between the district and the defendant's company. (*Ibid.*)

The temptation for self-dealing for the defendant in *Christiansen* was no different than when the defendant had been an employee performing the same services for the district, and the policy reasons behind the section 1090 prohibition on self dealing were equally relevant. The *Christensen* court nevertheless concluded that the defendant's change from an employee to independent contractor insulated her from any criminal liability for violation of section 1090. (*Christiansen*, *supra*, 216 Cal.App.4th at p. 1190.) I find it unlikely that such a holding is consistent with the intent of the lawmakers, and it certainly does not tend to effectuate the prophylactic purpose of section 1090. (See *Martinez*, *supra*, 49 Cal.4th at p. 50.)

Moreover, I find the *Christiansen* court's reasoning in support of its conclusion unpersuasive. The *Christiansen* court relies on *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1086-1087 (*Reynolds*), for the proposition that a statute should be construed using common law definitions of terms, unless the statute explicitly indicates otherwise. (*Christiansen*, *supra*, 216 Cal.App.4th at p. 1188.) The *Reynolds* decision involved interpretation of a Labor Code provision, and had adopted the common law tort definition

4

of the term "employee" in doing so. (*Reynolds*, *supra*, at p. 1087.) The *Christiansen* court ignored, however, that *Reynolds* had been abrogated on precisely that point. (*Martinez*, *supra*, 49 Cal.4th at pp. 62-63.)

Additionally, the definition of "employee" used in *Reynolds* had developed in the specific context of determining when an employer should be held liable in tort for injuries to third parties. (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 352.) *Christiansen* makes no attempt to grapple with the circumstance that section 1090 arose not from tort law, but rather the common law of conflicts of interest, which has very different history and fundamental purpose. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072-1073 (*Lexin*).) The issue in the section 1090 context is not the degree of control the putative employer has over its agent (as when courts consider whether to impute tort liability for injuries to third parties), but quite the opposite, the degree of influence the public servant has over the public entity's contracting decisions. (*California Housing*, *supra*, 148 Cal.App.4th at p. 690.) "Thus, the common law employee/independent contractor analysis is not helpful in construing the term 'employee' in section 1090." (*Ibid.*)

Finally, I am not persuaded that section 1090 may be interpreted differently depending on whether the case at bar is a criminal or a civil action. On its face, section 1090 articulates a rule; section 1097 makes *any* willful violation of that rule, or aiding or abetting of a violation, a criminal offense. (§§ 1090, 1097.) *Christiansen*'s distinction between the civil and criminal context not only lacks any basis in the statutory language or the legislative history. It also has no basis in prior case law. Before *Christiansen*,

5

courts routinely—and in my view properly—relied on both civil and criminal cases in interpreting the statutory language of section 1090, regardless of the nature of the case at bar. (E.g., *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1290-1291 (*Gnass*) [relying on civil cases to determine defendant had acted in official capacity for section 1090 purposes]; *California Housing*, *supra*, 148 Cal.App.4th at pp. 690-691 [citing *People v. Honig* (1996) 48 Cal.App.4th 289, 314 (*Honig*).) Indeed, *Christiansen*'s holding is inconsistent with the California Supreme Court's recent articulation of the elements necessary to establish criminal liability for violating section 1090, which describes the intent element as the only difference between the civil and criminal analysis. (*Lexin*, *supra*, 47 Cal.4th at p. 1074 [reciting elements of section 1090 violation, noting that "[p]roof of a violation of section 1097, the provision criminalizing violations of section 1090, requires a further showing that the section 1090 violation was knowing and willful."].)

Unlike the majority, I would reject *Christiansen*'s "narrow and technical"—and, in my view, simply incorrect—interpretation of section 1090, which limits the statute's scope and tends to defeat its legislative purpose. (*Honig*, *supra*, 48 Cal.App.4th at p. 314.) Instead, I would apply the reasoning of *California Housing* and *Hub City,* and hold that an independent contractor (as that term is used in the context of the common law of torts) may be an "employee" for the purpose of applying section 1090, at least where that person contracts with a public entity to perform services that carry "the potential to exert 'considerable' influence over the contracting decisions of a public agency . . . ." (*California Housing*, *supra*, 148 Cal.App.4th at p. 693.)

6

My review of the record also compels me to part ways with the majority's conclusion that there is a "total absence" of evidence that defendant was acting in an official capacity when he appeared before the hospital's board and recommended that the hospital enter into a contract with Dr. Barth. (Maj. opn., *ante*, at p. 14.) The majority, focusing on the terms of defendant's written contract with the hospital, asserts that defendant "was not hired or paid by the district to advise them on who they should hire or how much the district should pay." (Maj. opn, *ante*, at p. 16.) This analysis, however, ignores that "in construing section 1090 in any particular situation, '"[w]e must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts."'" (*California Housing*, *supra*, 148 Cal.App.4th at p. 691, quoting *Honig*, *supra*, 48 Cal.App.4th at p. 315.) Also, given the current procedural posture, we are bound to draw all reasonable inferences in favor of the information. (*Lexin*, *supra*, 47 Cal.4th at p. 1072.) I am not persuaded that the majority's discussion does so.

Viewed in the required light, the evidence establishes that defendant's official capacity as co-director of surgical services included the responsibility of acting as a consultant to the board of directors. The board, constituted primarily of individuals who are not themselves doctors, relies heavily on input from the hospital's medical staff—of which defendant was a part, by virtue of his position as co-director of surgical services— with respect to hiring doctors, in particular. Generally, this input is filtered through the Medical Executive Committee (MEC), the formal representative body of the medical staff. Defendant had served as an officer of the MEC at various times, but was a "power

7

broker" on the medical staff, regardless of whether he formally held an office on the MEC at any particular point in time.

Furthermore, with respect to the contract at issue in this petition, defendant went beyond merely recommending that the hospital hire Dr. Barth. He attempted (successfully) to leverage the power he had in his position as co-director of surgery to force the board to make the hire on the terms defendant preferred. He threatened to "remove admissions"—essentially, a form of work slowdown, whereby a doctor or group of doctors direct elective patients to other facilities for treatment, reducing the hospital's revenue—if the board did not sign the contract. It is no stretch to conclude that defendant's influence on the hospital's contracting decisions, both while acting in his capacity as co-director of surgical services, and in the other roles he had within the hospital that ultimately derive from that position, equals or exceeds the influence of the defendants in the several cases that the majority discusses, and who were determined to fall within the scope of section 1090. (See *Hub City*, *supra*, 186 Cal.App.4th at pp. 1119-1120 [independent contractor who had "assumed many of the city's waste management needs"]; *California Housing*, *supra*, 148 Cal.App.4th at p. 686 [outside counsel for government agency who "influenced" contracting decision]; *Gnass*, *supra*, 101 Cal.App.4th at pp. 1279-1280 [outside council for city, hired to advise on various bond issues].) While the majority attempts to distinguish these cases from the one at bar on their facts, I am not persuaded that any of the differences observed should make a difference. In my view, the reasoning of these cases, and particularly their articulation of the scope of section 1090, is equally applicable here.

It may well be that defendant purported to appear before the board solely as a representative of Dr. Barth, not in his role as co-director of surgical services. But the majority goes too far, in my view, when it states "the record is clear that [defendant] was appearing on behalf of Dr. Barth, not as a representative of the district . . . ." (Maj. opn., *ante*, at p. 17.) A fundamental principle of conflict of interest law is that a person who wears several hats cannot just set one of them aside and declare the absence of a conflict. (See *Lexin*, *supra*, 47 Cal.4th at p. 1073 [the judgment of a person with conflict of interest "'cannot and should not be trusted, even if he attempts impartiality.'"].) By negotiating on behalf of Dr. Barth with the board, defendant also necessarily, even if implicitly, advocated for the contract in his role as co-director of surgical services. If, as alleged, and as at least some evidence suggests, defendant did so while having a personal, financial interest in Dr. Barth's hiring, defendant had precisely the sort of conflict of interest that section 1090 is designed to prevent, and that section 1097 makes a criminal offense where the violation is willful.

For the above reasons, I respectfully dissent from the majority's ruling affirming the dismissal of the charge at issue.


HOLLENHORST
Acting P. J.


9